STATE of Wisconsin, Plaintiff-Respondent,

v.

Douglas J. PLUDE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2005AP2311–CR. Oral argument October 31, 2007.
—Decided June 10, 2008.*

2008 WI 58

(Also reported in 750 N.W.2d 42.)

30

For the defendant-appellant-petitioner there were briefs by *Stephen D. Willett* and *Stephen D. Willett, S.C.,* Phillips, and oral argument by *Stephen D. Willett.*

For the plaintiff-respondent the cause was argued by *Maura F.J. Whelan,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Willaim C. Gleisner, III* and the *Law Offices of William C. Gleisner III,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Robert H. Friebert, Matthew W. O'Neill,* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, on behalf of Wisconsin Utilities Association.

An amicus curiae brief was filed by *Paul E. Benson, Joseph Louis Olson, Thomas A. Janczewski,* and *Michael Best & Friedrich LLP,* Milwaukee, on behalf of the Civil Trial Counsel of Wisconsin.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We are asked to review a decision of the court of appeals[1] that affirmed the circuit court's[2] order denying Douglas Plude's motion for postconviction relief from his conviction of first-degree homicide, contrary to Wis. Stat. § 940.01 (2005–06). Plude's conviction was based on the death of his wife, Genell Plude. He sought to have the jury's verdict set aside and to have the charges dismissed or to have a new trial based on two allegations of error.

---

[1] *State v. Plude,* No. 2005AP2311–CR, unpublished slip op. (Wis. Ct. App. Mar. 6, 2007).

[2] The Honorable James B. Mohr of Vilas County presided.

¶ 2. First, Plude discovered after the completion of his trial that one of the State's expert witnesses, Dr. Saami Shaibani, who testified that the positions in which Plude said he found his wife's body were physically impossible[3] for an unconscious person to maintain, lied under oath about his credentials. Plude claims this is newly-discovered evidence that requires a new trial. Second, he contends that the State's failure to timely provide potentially exculpatory evidence, in the form of the content of computer hard drives and a copy of his wife's death certificate, deprived him of his constitutional right to present a defense.

¶ 3. We conclude that the discovery that Shaibani testified falsely about his credentials is newly-discovered evidence that gives rise to a reasonable probability that, had the jury heard Shaibani's misrepresentation about his credentials, it would have had a reasonable doubt as to Plude's guilt. Accordingly, we vacate Plude's conviction and remand to the circuit court for a new trial.[4]

## I. BACKGROUND

¶ 4. The State's theory is that Plude murdered Genell by poisoning her with Fioricet-codeine and then drowning her in toilet bowl water in their home. Plude contends that Genell committed suicide by taking an overdose of drugs, which served as a catalyst for a fatal occurrence of pulmonary edema.[5] In other words, Plude

---

[3] Plude's accounts of Genell's position when he found her varied.

[4] Because we grant a new trial, we do not consider Plude's arguments with respect to the computer hard drives and the death certificate.

[5] Pulmonary edema is the filling of the lungs with fluid created by one's own body.

32

theorizes that Genell drowned in fluids created by her own body.

¶ 5. In February, 1999, eight months before Genell's death, Genell and Plude began experiencing marital problems. The couple separated for a short time that spring, and Genell went to live with her parents in Minneapolis. The couple soon reconciled, however, and Genell again resided with Plude and his mother in their shared home in Land O' Lakes, Wisconsin.

¶ 6. Marital strain continued. On the day before her death, Genell told her mother that she had quit her job and that she wanted to leave Plude. Genell arranged for her parents to pick her up from her home early the next morning so that she could return to Minneapolis to live with them.

¶ 7. On the evening before her death, according to Plude, he and Genell went to bed together. A short time later, Genell got up to get medication for a headache. Plude went to sleep and in the hour between 5–6 a.m., Plude noticed that Genell was not in bed. He testified at the medical inquest that after calling for Genell he found her in the bathroom slumped over the toilet. He noticed that her hands were blue and her face was in the toilet bowl, which contained vomit.

¶ 8. The positions in which Plude claimed he found Genell were the subject of much testimony at trial. He told Officer Jennifer Kroschell the morning of Genell's death that he found Genell crouched on her knees facing the toilet, with her head pitched forward so that her face was in the toilet bowl, and with her arms draped loosely at either side. Officer Kroschell testified that Plude was "hysterical" when offering his account. Plude described a somewhat different position of Genell's body at the medical inquest. There, Plude described Genell as slumped over the bowl, her head

33

cocked to the left, with her face and hair in the water. Her left arm was draped around the bowl, with her right arm hanging loosely at her foot. She was situated on her knees.

¶ 9. According to Plude, he noticed vomit in the toilet; pulled Genell away from the toilet; screamed for his mother; and performed CPR on Genell. In his panic at her condition, he cracked her sternum while performing CPR. Plude's mother awoke and became panicked upon observing the scene. Her panic precluded her from calling 911, so Plude stopped performing CPR to do so.

¶ 10. Paramedics arrived, and Plude assisted them in attending to Genell.[6] One of the paramedics, Sid Baake, testified that when he arrived at the Plude home, Plude was still performing CPR on Genell. Baake testified that Plude was crying, "I think that she is gone. Help me. Help me."

¶ 11. Genell was conveyed to a hospital, where she was pronounced dead. An attending nurse in the emergency room overheard Plude say to Genell's corpse, "I told you not to leave me."

¶ 12. Investigation of her death uncovered that Genell had ingested 40 Fioricet with codeine capsules. Genell had obtained a prescription for the drug some time in 1997.

¶ 13. Dr. Kenneth Sullivan, the emergency room doctor who attended to Genell, testified at trial. He concluded that Genell drowned because Genell had fluid in her lungs. Although the fluid was consistent with pulmonary edema, he could not determine to a reasonable degree of scientific certainty whether the fluid came from pulmonary edema or from a source

---

[6] At one point, Plude had been employed as a paramedic.

outside her body. Dr. Sullivan also noted a bruise on the side of Genell's neck. He testified that the appearance of the bruise would have required "some force" beyond just the weight of her head.

¶ 14. Beyond the presence of fluid in her lungs, which may have come from the toilet bowl or may have come from her own bodily function, the presence of lethally high levels of drugs were in Genell's body when she died. Casey Collins, a toxicologist at the Wisconsin State Crime Lab, testified that he took blood samples, urine samples, a liver sample, a kidney sample, and a stomach content sample from Genell's body. He also took samples of the toilet bowl water. Genell's body and the toilet bowl water showed the presence of the same four drugs: Acetaminophen (Tylenol), codeine (an opiate), butalbital (a barbiturate), and caffeine.

¶ 15. Collins testified to the lethal levels of each drug, and the amount Genell had in her body. Codeine is lethal at a level of 1.6 mg/liter, and Genell had 20 mg/liter in her body. Butalbital is lethal at a range of 13–26 mg/liter, and Genell had 18 mg/liter in her body. Acetaminophen is lethal at a level of 160 mg/liter, and Genell had 213 mg/liter in her body. Moreover, there were only a few milligrams of these drugs left in her stomach, indicating that the drugs were almost completely absorbed before she vomited.

¶ 16. Given the drug doses in Genell's body, Dr. Mitra Kalelkar, the Assistant Chief Medical Examiner at the Cook County, Illinois Medical Examiner's Office, testified that Genell drowned as a result of "combined drug intoxication" that caused pulmonary edema. Dr. Kalelkar testified that the weight of Genell's lungs was consistent with pulmonary edema. He testified that the Fioricet-codeine in Genell's body slowed her heart rate, which in turn caused her circulation to slow, which in

turn caused fluid to accumulate in her lungs. Ultimately, Dr. Kalelkar concluded that Genell drowned due to reduced blood circulation caused by the presence of drugs in her body.

¶ 17. Dr. Kalelkar also testified to Genell's condition at her death. He said that there was no indication that Genell inhaled any toilet bowl water. He said that the bruise on her neck was not the result of an outside force pressing her neck against the rim of the toilet; rather, the bruise on her neck resulted simply from her lying on the rim of the toilet. In addition, he stated that there were no injuries to her neck and trachea in places one would expect to find them if her head had been forced into the toilet bowl.

¶ 18. Moreover, although Dr. Kalelkar concluded that Genell died from a drug overdose, he also opined that she did not die from a forced overdose. He testified that the amount of drugs found in Genell's body indicates that, if she did not take them voluntarily, they would have to have been forcibly administered to her; however, her body showed no evidence that she had engaged in a struggle.

¶ 19. Dr. Kalelkar provided one last item of note. While the nurse in the emergency room found Plude's statement that "I told you not to leave me" disturbing, Dr. Kalelkar testified that such a statement is not unusual. He testified that the statement was "a manifestation of the anger which is . . . part of the grieving process."

¶ 20. Dr. Robert Huntington, the pathologist who performed Genell's autopsy, added to the cacophony of disparate medical opinions regarding the cause of Genell's death. For instance, Dr. Huntington testified that the bruise on Genell's neck was the result of "blunt force" administered while Genell was still alive. He also

opined that the fluid in Genell's lungs was inconsistent with pulmonary edema. He testified that when pulmonary edema occurs, the lungs fill with fluid in concentrated places. However, the fluid in Genell's lungs was spread over a wide area; therefore, it was his conclusion that the fluid likely came from a source outside of her body.[7] Dr. Huntington also testified that Genell had enough drugs in her bloodstream to kill her. His ultimate conclusion was that Genell "died of drug intoxication probably abetted by drowning." He testified that Genell's death was either a suicide or a homicide, but he could not say to a reasonable degree of scientific certainty which had occurred.

¶ 21. Dr. Huntington testified that his lack of clarity over the manner of Genell's death stemmed from certain facts that he could not explain. For example, he said that he would want the neck bruise explained; he would want to know why her limp body stayed upright around the rim of the toilet instead of rolling back onto the floor; and he did not know what accounted for the hemorrhaging in her lungs.

¶ 22. Julius Ballanco, a consulting engineer, testified regarding the physical mechanics of a toilet. He testified that toilets are designed such that the mouth and the nose cannot be submerged accidentally and simultaneously into the toilet bowl water, but that it is possible for a person accidentally to submerge the forehead and nose into the toilet bowl water. In addition, Ballanco opined that the toilet in the Plude home had not been flushed because it contained vomit when Plude found Genell. Ballanco was able to surmise,

---

[7] Apparently, no testing was done on the fluid in Genell's lungs to see if it was consistent with the water from the toilet bowl or with bodily fluid.

however, that there had been approximately one pint of water displaced from the toilet. He concluded that the displacement of this amount of water would have had to come from some force greater than vomiting.

¶ 23. We now turn our attention to the testimony of Shaibani. Shaibani, who is not a medical doctor, set forth his credentials under oath and in his curriculum vitae admitted as an exhibit at trial. He represented himself as a clinical associate professor at Temple University and as a specialist in "injury mechanism analysis."[8] He said that as part of his duties at Temple University he taught physicians and surgeons about injury. He described injury mechanism analysis as a field of scientific study that "combines physics, trauma, and engineering" "to determine whether or not an injury could have been caused by the circumstances involved." With regard to his duties as a clinical assistant professor at Temple University and his expertise in injury mechanism analysis, Shaibani testified as follows:

Q: Why don't you explain to the jury exactly what injury mechanism analysis is?

. . . .

A: The injury mechanisms analysis is a scientific study to determine whether or not an injury could have been caused by the circumstances involved. It combines physics, trauma, and engineering.

Q: How do you get to be someone who specializes in injury mechanisms analysis?

---

[8] Plude claims that Shaibani invented this field of specialty and that "[n]o other person on the face of the earth considers himself or herself an expert in the field of injury mechanism analysis." Pet. Br. at 6.

38

A: I ask myself that every day, in fact.

But, basically, you have to have a background in each one of those three disciplines that I mentioned.

You need to have a good understanding of physics because that's one of the main sciences.

You need to have a background in trauma because that's what injury relates to.

Then it helps if you have a background in engineering, if nothing else, to prove that you are a practical animal.

Q: As a clinical professor, what do you consider your responsibilities to be?

A: I have two main areas of responsibilities. I teach and I do research. My teaching is to physicians and surgeons, fully qualified medical doctors, and I teach them about injury. It's one of those curious things that they don't learn about injury in medical school. So I explain how injuries are caused, how they can be prevented, how they can be treated under certain circumstances.

Shaibani also testified that he has a Master's Degree in Crystal Physics and Metallurgy, a Master's Degree in Science of Materials, and a Ph.D. in Material Physics, all from Oxford University.

¶ 24. Shaibani was received as an expert in the area of injury mechanism analysis by the circuit court. He testified regarding the interrelation between the mechanics of the human body and the laws of physics. He explained the effect of the interrelation on the positions in which Plude said he found Genell's body, and he explained whether she could have lost consciousness and drowned herself in the toilet bowl water.

39

¶ 25. Shaibani performed a number of experiments with various human models having Genell's reported height and weight[9] to replicate the positions in which Plude explained he found Genell. The State's expert, Dr. Huntington, testified that it was more likely than not that the fluid in Genell's lungs came from toilet bowl water rather than from her own bodily processes, i.e., from pulmonary edema. Shaibani took Dr. Huntington's conclusion further. He testified that his experiments indicated to a reasonable degree of scientific certainty that Genell could not have inhaled toilet bowl water on her own; that it would have required 60 pounds of pressure to the back of her head to get her face in the toilet bowl water and keep it there.

¶ 26. After describing his experience and purported expertise, Shaibani testified that he used a model to simulate the position in which Plude first claimed he found Genell:

Q: What was the first step in the testing that you did to answer each of these questions?

A: I began at the beginning. One of the first things that I'm aware of is a statement that the defendant made to Deputy Krosschell [sic]. I'm reading from that report in which she relates the following. Douglas stated he observed Genell on her knees in front of the toilet with her arms down to the side and her face in the toilet bowl. That's the first statement that he has given to anyone, so I'm going to begin at the beginning and see what the sign says, as far as looking at that is concerned.

Q: Why don't you tell the jury what you did in that regard. Could you indicate what exhibit you are looking at for the record and how you are going to do that for the jury?

---

[9] Genell was reported to stand approximately 5 feet, 8 inches and weigh approximately 140 pounds.

A: Yes, sir. This is State's Exhibit 184. It has the caption, defendant's first story, and there is some space on this exhibit for me to show the results of the test that I conducted to look at this.

. . . .

A: So if we look at this description given by the defendant, that Genell is on her knees, with her arms down to the side and her face in the toilet bowl, I got somebody of the same height, the same weight, and the same gender, with the same toilet bowl that you see here, and I asked her to try and put her head in the toilet, and, for purposes of identification, this is Photograph 2774.

. . . .

Q: Now, in that position, was the head able to go into the water?

A: In some circumstances, the head—and when I say "the head," I mean the forehead and the top of the head—possibly could, but at no stage could the face be in the water. It's important to make that distinction because the defendant says her face was in the toilet bowl. It becomes ambiguous as to what part of the bowl you are referring to. Later on, we'll be looking at the face in the water.

¶ 27. Shaibani then conducted a similar experiment with the chosen model in the second position in which Plude explained he found Genell:

Q: Let's go to the second set. Again, refer to the exhibit, if you would. This is?

. . . .

A: Oh, thank you, sir. Defendant's second story. We see a significant change now in how he reports the circumstances of how he found Genell.

41

Q: Go ahead.

A: I've got at least six different occasions where he states her face was into the water. Her face was in the water. Her face was in the water. Her face was in the water there. At least four instances that I have just told you where he says, again and again, her face, not her head, is in the water, not the bowl.

On other occasions, he talked about her head being in the bowl, but now we've got an important change that, on four instances, at least that I can find, her face was into the water.

. . . .

So this is a new development. Her face is now in the water is what the defendant is saying.

In addition to that, he describes that she was cocked to one side, kind of on her hip with her left arm on the bowl, her right hand was hanging down.

So now we've got a lot more detail than we had in the first story. No longer the hands on either side of the knees that we saw in those first photographs. We've got a completely different scenario.

. . . .

A: . . .This is interesting because, if your left hand is in the position that we think the defendant is describing, then, because your arm is of a certain length and your body is arranged a certain way, if you are five foot eight and a half inches and you weigh 140 pounds and you are female, things fit together a certain way anatomically, and, under the circumstance, for this particular interpretation, not all of them, but for this particular interpretation, that face is clearly not going to be in the water.

Then you've got your chest getting in the way, you've got your neck getting in the way, and there is

42

no way, physiologically or anatomically under this one way of looking at it, for the face to be in the water.

. . . .

A: What was interesting, when we positioned this particular volunteer, with the legs coming to the left towards us as we look, is that once you are in that position, and I say to the volunteer, let your muscles go limp and relax, a very surprising thing happened, and that is, she fell out. You can see that I gallantly came to the rescue and stopped her head falling on the floor because that's my hand there. So she is falling out. She is trying to kind of artificially prop herself up there using muscle tone, muscle tension. And the moment I said to her, relax, let go, whoops, she was out of there, she was gone.

Q: Now, for that set of circumstances and the experimenting that you did, is what resulted there, would that be the force of gravity that we talked about?

A: Yes, sir. These are experiments. After we've gone through these sequences, I'll then show the interpretation of these results analytically.

Q: But, for purposes of that one experiment, is the result going to be the same result every time that set of circumstances exists, to a reasonable degree of scientific certainty?

A: Yes, sir, or a very small variation on the theme. It's going to be substantially similar.

¶ 28. In summation of how the models depicted the first two positions in which Plude claimed he found Genell, Shaibani testified that the models could not maintain either position:

43

A: The issue here is that you can shuffle this around any way you want. The overall result is going to be, broadly similar, that gravity will take over the body in the first sequence. Gravity will take over the body in the second sequence and cause the body to slump out and down to the right.

Q: Is that your opinion, to a reasonable degree of scientific certainty?

A: Yes, sir, it is.

¶ 29. From here, Shaibani went on to talk about "force." His experiments revealed that his models could not keep their heads in the toilet bowl once they relaxed their muscles, because the force of gravity caused them to "fall out," down and to the right. So, in order for Genell's head to have been in the bowl, as Plude claimed he found her, Shaibani testified that her head had to have been kept there by a force, and that force would be approximately 60 pounds of pressure:

A: ... If you weigh 140 pounds, it turns out that nine pounds of your body weight is above your neck; sawdust or otherwise between your ears. Now, if there are nine pounds on your head, then there must be only 131 left over for the rest of your body. So we put a demarcation now of two different forces. We can break the body down as far as it pivoting about this fulcrum.

. . . .

A: So we have to first balance the weight, which is divided up into nine pounds on the head and 130 pounds or 131 pounds on the rest of her body. You can see that, if we look at this as a fulcrum, then the left-hand side of her body, the main part of her body is going to go down and the head is going to go up.

44

Q: Is that principle an opinion to a reasonable degree of scientific certainty?

A: Yes, it is. But we haven't finished what we are doing here because I've got only two forces. What about the force on the knee, the hands, and the feet? We've got to include those. So the hands were one inch in front of the fulcrum; there was a force there of five pounds. The knees, we had a force of about 90 pounds going up. The feet, we had a force of about 25 pounds going up. Then, one final force is 20 pounds on that part of the upper body. So each one of these forces is going to try and make Genell go down and rotate her clockwise into the bowl or they are going to rotate her counterclockwise out of the bowl. If you add up all of these forces and take into account the distances which we saw were important in our seesaw demonstration [omitted from this excerpt], then overwhelmingly her body wants to come out. There is just too much weight outside the toilet, even though it has been supported at the knees and at the feet. There is still too much weight pulling her down, down, down, out, out, out, away, away, away from that water. So that says, well, what would you have to do to get her head into the water?

Q: Her face into the water?

A: Her face into the water. If you want her face into the water, and the laws of physics tell us that the body is rotating out, you have to counteract that. You have to apply an external force at some attack distance to make sure that the head stays down as opposed to going out. This is an external force.

 All of these other forces deal with what Genell is doing with the floor supporting her. These are the only things she has control over and she is going to go out of that toilet, down and away. The only way her head can go down is if there is an external force applied.

. . . .

45

Q: Were you able to calculate how much force would be required to get Genell's face into that bowl and suspend it there?

A: Yes. You can do that with the laws of physics. For over 300 years, what that external force is at, that attack distance, consistent with her body, and that result is on the order of 60 pounds, if you wanted to pick a typical value.

Q: Now, I want you to look at the defendant over there. Would somebody about that big in height be able to exert that kind of outside force?

A: Very easily, sir, yes.

Q: What kind of force would it take to keep the head there?

A: Once you've got it down and the body is moving, it's easier to keep something moving than it is to start it moving. So once you've got it down, you can maintain that force with relatively little effort.

. . . .

Q: I have nothing further.

And—one question: Is that to a reasonable degree of scientific certainty; that opinion?

A: Yes, sir, it is.

¶ 30. The jury convicted Plude of first-degree homicide, and he was sentenced to life in prison. After the verdict, Plude discovered that Shaibani had lied on the witness stand, and he moved for postconviction relief.[10]

---

[10] Plude states that he discovered that Shaibani misrepresented himself when Shaibani attempted to testify untruthfully before a North Carolina court.

The circuit court concluded that even though the State had stipulated that Shaibani was not a clinical professor at Temple University, there was no evidence that his false statements "concerning his curriculum vitae made his opinions unreliable, therefore, no prejudice to the defendant has been shown." The circuit court did not evaluate whether a reasonable probability existed that a different result would be reached at a new trial if the jury knew that Shaibani misrepresented his credentials. The court of appeals affirmed the circuit court's denial of a new trial based on newly-discovered evidence because it concluded that "Plude intimated he was only challenging Shaibani's credibility, not his qualifications to testify as an expert." *State v. Plude,* No. 2005AP2311–CR, unpublished slip op., ¶ 28 (Wis. Ct. App. Mar. 6, 2007). Plude petitioned for review, which we granted.

## II. DISCUSSION

### A. Standard of Review

¶ 31. Plude requests a new trial through his contention that the discovery of Shaibani's misrepresentations constitutes newly-discovered evidence. The decision to grant or deny a motion for a new trial based on newly-discovered evidence is committed to the circuit court's discretion. *State v. Boyce,* 75 Wis. 2d 452, 457, 249 N.W.2d 758 (1977). A circuit court erroneously exercises its discretion when it applies an incorrect legal standard to newly-discovered evidence. *State v. McCallum,* 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997).

B. Newly-Discovered Evidence[11]

 1. General principles

██

¶ 32. In order to set aside a judgment of conviction based on newly-discovered evidence, the newly-discovered evidence must be sufficient to establish that a defendant's conviction was a "manifest injustice." *State v. Krieger,* 163 Wis. 2d 241, 255, 471 N.W.2d 599 (Ct. App. 1991). When moving for a new trial based on the allegation of newly-discovered evidence, a defendant must prove: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *McCallum,* 208 Wis. 2d at 473. If the defendant is able to prove all four of these criteria, then it must be determined whether a reasonable probability exists that had the jury heard the newly-discovered evidence, it would have had a reasonable doubt as to the defendant's guilt. *Id.*

██

¶ 33. "A reasonable probability of a different outcome exists if 'there is a reasonable probability that a

---

[11] Based on Shaibani's misrepresentations, Plude seeks to have his conviction vacated and a new trial ordered on three separate bases: (1) Shaibani's false testimony violated his right to due process of law; (2) Shaibani's testimony is incredible as a matter of law; and (3) Shaibani's false testimony, which the State acknowledges constitutes newly-discovered evidence, is such that there is a reasonable probability that if a jury heard of Shaibani's misrepresentation of his credentials, the outcome at trial would have been different. Because we determine that Plude is entitled to a new trial on the last basis, we do not consider his first two contentions.

48

jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt.' " *State v. Love,* 2005 WI 116, ¶ 44, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted). A court reviewing newly-discovered evidence should consider whether a jury would find that the newly-discovered evidence had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt. *McCallum,* 208 Wis. 2d at 474. This latter determination is a question of law. *See id.* Manifest injustice has been shown and a new trial must be ordered when: (1) the four factors of newly-discovered evidence are established; and (2) a court determines that had a jury heard the newly-discovered evidence, it would have had a reasonable doubt as to the defendant's guilt. *See Krieger,* 163 Wis. 2d at 255.

2. The parties' positions

¶ 34. The State concedes that with the revelation that Shaibani lied under oath, Plude has satisfied the four criteria for proving newly-discovered evidence of the type that may cause the ordering of a new trial. However, the State argues those criteria are not sufficient to warrant a new trial here because Shaibani's false testimony does not give rise to a reasonable probability that a different verdict would have been reached at trial. The State admits that if Shaibani's false testimony about his fictitious professorship at Temple University had been revealed during Plude's trial, the revelation would have unquestionably diminished Shaibani's credibility in the eyes of the jury. However, the State nonetheless argues that Shaibani's credibility would not have been tarnished to the degree that the jury would have found his testi-

mony unreliable and found Plude not guilty, because the evidence marshaled against Plude at trial was overwhelming.

¶ 35. Plude counters the State's arguments by contending that there is a reasonable probability that Shaibani's testimony sealed the jury's verdict of guilty. Plude asserts that it was Shaibani's testimony that cast doubt on Plude's descriptions of the positions in which he found Genell's body. This was significant to Plude's defense that Genell committed suicide by a drug overdose. It was also significant to the State's theory that Genell drowned in water from the toilet bowl rather than in her own bodily fluid. Plude asserts that if he had been able to impeach Shaibani, three results would have followed: (1) Shaibani's overall credibility as an expert witness would have been attacked effectively;[12] (2) the methods Shaibani used to support his testimony that Genell could not have been found in the positions Plude described would have been discredited; and (3) Shaibani's conclusion that Genell could not have drowned in toilet bowl water unless her head was forced into the toilet bowl would have been undermined. Accordingly, Plude maintains that Shaibani's false testimony no doubt affected the jury's verdict because Shaibani played the preeminent role in linking Plude to the inculpatory testimony of Dr. Huntington, who opined that Genell drowned in toilet bowl water, rather than from pulmonary edema.

---

[12] Although Plude did not object to Shaibani being admitted as an expert at trial, once he discovered that Shaibani lied about his teaching post at Temple University, he objected to Shaibani's admission as an expert. In his post-conviction motion, Plude argued that Shaibani was no longer qualified to testify to the mechanics of the human body.

### 3. Reasonable probability

██

¶ 36. We conclude that in a trial rife with conflicting and inconclusive medical expert testimony about a case the circuit court observed was based on "circumstantial evidence," there exists a reasonable probability that, had the jury discovered that Shaibani lied about his credentials, it would have had a reasonable doubt as to Plude's guilt. Our conclusion is based on Shaibani's testimony as a quasi-medical expert notwithstanding his lack of a medical education and on the link that Shaibani's testimony provided to other critical testimony that related to the manner of Genell's death.

¶ 37. Shaibani testified that based on his knowledge about the mechanics of the human body, Genell's body could not have been found in the positions that Plude described and that her nose and mouth could not have submerged in toilet bowl water without someone forcing her face under the water. Because Shaibani had no medical education where the human body would have been studied, he lent support to his opinions about the human body by the description of his work as a clinical professor at Temple University. He said that at Temple University he taught "physicians and surgeons, fully qualified medical doctors, and I teach them about injury [to the body]," even though he had no medical degree. He specifically opined that Genell could not have inhaled toilet bowl water on her own; that it would have required 60 pounds of pressure, pressure that he said Plude "very easily" could have exerted, to the back of her head to get her face in the toilet bowl water and keep it there.

¶ 38. Plude cites *Giglio v. United States*, 405 U.S. 150 (1972), as support for his position. However, *Giglio*

was driven by a violation of due process, rather than, as here, by newly-discovered evidence that does not implicate a violation of due process.[13] However, just as in *Giglio,* Shaibani's diminished credibility as an expert due to his misrepresentation may have affected the reliability of his testimony as well because only an expert witness could testify as to the opinions he gave.

¶ 39. In *Giglio,* the Supreme Court reversed Giglio's conviction for passing forged money orders because the State did not disclose that its key witness, a co-conspirator with Giglio, was promised immunity in exchange for his testimony. *Id.* at 150–53. The co-conspirator had testified at trial that he did not have an immunity agreement with the government, and the prosecuting attorney confirmed this in closing argument. *Id.* at 151. Even though the prosecuting attorney was unaware that an immunity agreement had been made, the court attributed the knowledge of the agreement to the prosecuting attorney. *Id.* at 154.

¶ 40. As part of its analysis of whether Giglio should be granted a new trial, the Supreme Court observed that a new trial is required if there exists a reasonable likelihood that the false testimony of a witness affected the judgment of the jury:

> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. . . . A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."

*Id.* at 154 (citations omitted).

---

[13] A defendant's due process rights are violated when the newly-discovered evidence is evidence that the government knew about, but did not disclose. *Giglio v. United States*, 405 U.S. 150 (1992); *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 41. In much the same way, Shaibani's misrepresentation may have been determinative of Plude's guilt or innocence. For example, Dr. Kenneth Sullivan, the emergency room doctor, concluded that Genell drowned, and that her drowning could have been due to pulmonary edema or to inhalation of toilet bowl water. He did not testify to either possibility to a reasonable degree of scientific certainty. However, Dr. Sullivan concluded that the bruise on Genell's neck would have required "some force" other than the weight of her head.

¶ 42. On the other hand, Dr. Kalelkar, of the Cook County Medical Examiner's Office, concluded that Genell died of "combined drug intoxication" that led to her drowning in her own bodily fluid, i.e., due to pulmonary edema. He explained that the weight of Genell's lungs was consistent with pulmonary edema; that the drugs caused her heart rate to slow, which caused her lungs to fill with her own bodily fluid. In contrast to Dr. Sullivan, Dr. Kalelkar concluded that there was no indication that Genell inhaled any toilet bowl water. Further, he testified that the bruising on her neck resulted from the weight of her head resting over the rim of the toilet bowl. He also said that there was no injury to her neck and trachea of the type that one would expect to find if her head had been forced into the toilet bowl.

¶ 43. Meanwhile, Dr. Huntington, the pathologist who performed Genell's autopsy, concluded that the fluid in her lungs was inconsistent with pulmonary edema, but he did not opine to a reasonable degree of scientific certainty that she drowned from inhaling toilet bowl water. He also concluded that she had enough drugs in her body to kill her, as had Dr. Kalelkar. Dr. Huntington's ultimate conclusion was that

she died of "drug intoxication probably abetted by drowning." Dr. Huntington opined Genell's death was either a suicide or a homicide, but he could not say which had occurred. Moreover, he concluded that the bruise on her neck came from "blunt force."

¶ 44. Although Ballanco's testimony may be perceived as inculpatory because he testified that toilet bowls are designed so that one cannot accidentally submerge both the nose and mouth under the water, Ballanco also testified that it was possible accidentally to submerge the forehead and nose in the water. His two conclusions would have been insufficient for the jury to convict Plude because they did not rebut Plude's theory that Genell drowned as a result of pulmonary edema, rather than as a result of forced drowning.

¶ 45. The expert medical testimony also does not rule out the possibility that Genell drowned as a result of pulmonary edema. Accordingly, Ballanco's testimony, in contrast to Shaibani's testimony, does not directly implicate Plude in Genell's drowning. For example, Ballanco said nothing about the force necessary to submerge Genell's nose and mouth under the water in the toilet bowl, but Shaibani did. Ballanco also said nothing about the credibility of Plude's descriptions of the position of Genell's body when he found her, but Shaibani did. Ballanco's testimony leaves open the question of whether Genell drowned due to pulmonary edema caused by the effect of drugs on her bodily functions. Shaibani's opinion testimony sets out facts that cause Plude's credibility to be questioned. In so doing, it raised the probability that forced drowning occurred, and by inference, it lowered the probability that drowning due to pulmonary edema occurred.

¶ 46. In sum, with the exception of Dr. Kalelkar's opinion, which was *exculpatory* of Plude, the medical

expert opinions with regard to Genell's manner of death were inconclusive. Dr. Kalelkar concluded to a reasonable scientific certainty that Genell drowned from pulmonary edema; Dr. Sullivan concluded that it was likely, but not a reasonable scientific certainty, that Genell drowned from pulmonary edema; Dr. Huntington concluded that it was likely, but not a reasonable scientific certainty, that Genell drowned from inhaling toilet bowl water. Shaibani affirmed Dr. Huntington's opinion and linked Plude to Genell's inhalation of toilet bowl water. Therefore, Shaibani's testimony was a critical link in the State's case.

¶ 47. Wisconsin law has long held that impeaching evidence may be enough to warrant a new trial. *Birdsall v. Fraenzel,* 154 Wis. 48, 142 N.W.2d 274 (1913). In commenting on the discovery that a trial witness could read and write English after he testified to the contrary, we stated: "It may well be that newly discovered evidence impeaching in character might be produced so strong as to constitute ground for a new trial; *as for example where it is shown that the verdict is based on perjured evidence." Id.* at 52 (emphasis added).

¶ 48. Our conclusion that Shaibani's false testimony about his credentials is a significant link to establishing unassisted drowning in water from the toilet bowl as a cause of Genell's death is distinguishable from the court of appeals' conclusion in *State v. Sprosty,* 2001 WI App 231, 248 Wis. 2d 480, 636 N.W.2d 213. In *Sprosty,* the court of appeals concluded that there was no reasonable probability that false testimony by a witness, who misrepresented his credentials, would lead to a different outcome because the witness maintained his expertise in spite of the false testimony and another expert corroborated his substantive testimony. *Sprosty,* 248 Wis. 2d 480, ¶ 34. Here, Shaibani's

credentials were not maintained subsequent to his misrepresentation and no expert corroborated his substantive testimony.

¶ 49. The inconclusive inculpatory medical expert testimony at Plude's trial leads us to conclude that Shaibani's quasi-medical expert testimony creates a reasonable probability that the jury hearing of Shaibani's false testimony about his credentials would have had a reasonable doubt as to Plude's guilt. The circuit court did not apply the legal standard of whether there is a reasonable probability that the jury hearing of Shaibani's false testimony would have had a reasonable doubt as to Plude's guilt. Failing to apply the proper legal standard is an erroneous exercise of discretion. *McCallum,* 208 Wis. 2d at 473. Accordingly, the circuit court erroneously exercised its discretion when it did not order a new trial for Plude.[14]

## III. CONCLUSION

¶ 50. We conclude that the discovery that Shaibani testified falsely about his credentials is newly-discovered evidence that gives rise to a reasonable probability that had the jury heard of Shaibani's misrepresentation about his credentials, it would have had a reasonable doubt as to Plude's guilt. Accordingly, we vacate Plude's conviction and remand to the circuit court for a new trial.

---

[14] The concurring opinion suggests that our opinion may be read to grant a new trial to a defendant as a matter of course whenever an expert witness falsely represents his or her credentials. *See* Justice Ziegler's concurrence, ¶¶ 90, 97. We do not create such a per se rule.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.

¶ 51. LOUIS B. BUTLER, JR., J. *(concurring)*. I join the majority opinion. I write separately because I also agree with Justice Ziegler that this matter can be reversed pursuant to Wis. Stat. § 751.06, discretionary reversal, as the real controversy has not been fully tried. I therefore respectfully concur.

¶ 52. ANNETTE KINGSLAND ZIEGLER, J. *(concurring)*. I concur with the majority opinion because I cannot condone the conduct of an expert who was called to refute the defendant's credibility but then that expert falsified his testimony before the jury. In a case such as this, where it is largely circumstantial and credibility is critical, a jury should be entitled to reach its conclusions based on evidence that is not derived from a witness who fabricates his credentials. Here, a serious question exists as to whether the interests of justice were served.

¶ 53. Even beyond the information known to the circuit court about Dr. Shaibani misrepresenting his affiliation with Temple University, it has been subsequently alleged that Shaibani was not employed at Virginia Tech, never worked for the U.S. Department of Justice, never worked for or contracted with the Federal Bureau of Investigation, never worked for Conemaugh Memorial Medical Center, and was never officially recognized as the "scientific advisor" for a violent crimes response team in Bedford, Virginia.[1] These new allegations, coupled with the existing misrepresenta-

---

[1] Plude's counsel sent a letter to the Wisconsin Department of Justice (DOJ) in January 2006 alleging these facts. The letter

tions by Shaibani presented to the circuit court, lead me to the conclusion that the real controversy was not fully tried and, thus, reversing in the interest of justice is warranted.

¶ 54. I write separately because I respectfully disagree with the majority's conclusion to decide this case on the basis of newly-discovered evidence. I do not believe that the circuit court erroneously exercised its discretion, as the majority concludes. I have concerns over the development of the law and how the majority's decision squares with existing precedent and longstanding jurisprudence. I am concerned that we are not providing clear direction to the users of the courts. My preference would be to remand for a new trial in the interest of justice or to remand to the circuit court so it could consider whether a new trial should be conducted given the new allegations of misrepresentations, whether Shaibani would still qualify as an expert, and the theory of "newly-discovered evidence" advanced by the majority. Accordingly, I respectfully concur.

## I. INTEREST OF JUSTICE

¶ 55. I respectfully disagree with the majority's decision to decide this case on the theory of newly-discovered evidence. Instead, this case should be decided pursuant to Wis. Stat. § 751.06, "Discretionary reversal." That section provides this court with unique, discretionary authority to order a new trial when we conclude that the real controversy has not been fully tried or when there is a probable miscarriage of justice. "[T]he court of appeals, like this court, has broad power

and the DOJ's response is found in the appendix of Plude's reply brief, which may be obtained at the Wisconsin State Law Library, Madison, Wisconsin.

of discretionary reversal." *Vollmer v. Luety,* 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). When the discretionary reversal power is invoked on the grounds that the real controversy has not been fully tried, "it is unnecessary for an appellate court to first conclude that the outcome would be different on retrial." *Id.* However, under the newly-discovered evidence theory, the majority must, and it does, reach the conclusion that the outcome would likely be different. *See* majority op., ¶ 49. In light of the evidence presented at trial, I am not so certain.

¶ 56. In this case, Shaibani was called as a witness to prove that Plude was not truthful. Plude described to the police how he found his wife slumped over the toilet with her face in the toilet bowl. He gave at least three different versions of how he found her, but each account included her face being in the toilet. Dr. Shaibani was called as a witness to refute those statements.

¶ 57. Shaibani was an important witness because he assisted the jury in making an inferential step towards guilt. Shaibani was the only expert who tested Plude's statements of how he found Genell, and Shaibani was the only witness who directly attacked Plude's credibility. Simply stated, given the findings from Shaibani's injury mechanism analysis testing, Plude's statements to the police could not be true.

¶ 58. The majority spends much time discussing how Shaibani's testimony takes Dr. Huntington's[2] testimony that Genell drowned in the toilet bowl a critical step further.[3] I disagree. Either Shaibani or Julius

---

[2] Dr. Huntington testified as the State's pathologist.

[3] If we are to weigh the testimony that relates to the elements of the offense, we would typically be evaluating the sufficiency of the evidence. Here, in my view, when considering the sufficiency of the evidence as to the ultimate question of

Ballanco's[4] testimony could serve that purpose. No other witness, however, went to the heart of Plude's credibility like Shaibani. Here, if the jury believed Shaibani, the jury could not believe Plude. Under the facts of this case, because Shaibani's testimony was offered to tarnish the defendant's credibility and Shaibani lied to the jury, the matter was not fully tried. Shaibani's reprehensible misrepresentations lead me to conclude that the real controversy was not fully tried, and it is in the interest of justice that the matter be retried.

## II. MAJORITY OPINION

¶ 59. I believe we should reverse in the interest of justice. The majority, on the other hand, reverses on a theory of newly-discovered evidence. This, however, produces five points of concern that preclude me from joining the majority. First, I disagree with how the majority opinion views the theory of the case, both for the State and the defense. Second, Plude never argued the newly-discovered evidence theory set forth by the majority, and thus, the circuit court could not have erroneously exercised its discretion. Third, the newly-discovered evidence theory does not dictate reversal in this case. Fourth, I do not believe the majority explains why this case is different from other cases where an expert lied about his or her credentials. As a result, I believe the majority opinion may be viewed as contrary

---

guilt, there was sufficient evidence. I depart from the majority's focus on the idea that Shaibani took Dr. Huntington's testimony further as to the theory of involuntary drowning because I believe that analysis comes dangerously close to a sufficiency of the evidence determination.

[4] Julius Ballanco testified as the State's consulting engineer.

to precedent. I, however, find this case distinguishable from other Wisconsin precedent. Fifth, I fear the majority opinion could be viewed as decreasing the circuit court's role in evaluating expert testimony.

A. Theory of the case

¶ 60. The majority believes that the State's theory of the case was that Plude murdered Genell by poisoning her and then drowned her in the toilet bowl water. *See* majority op., ¶ 4. The majority opinion thus focuses on Shaibani's testimony as it relates to possible forced drowning. However, the State's theory was not that Plude drowned Genell, but rather, that he caused her death by giving her an overdose. The defense's theory was that she committed suicide by an overdose.[5]

¶ 61. The majority, in relying on the substance of Shaibani's testimony to conclude that the jury found Plude guilty because he drowned his wife, in my view, misses the point. Shaibani's testimony was only relevant for the purpose of attacking Plude's statements to the police. He was not introduced in support of the theory that Plude drowned his wife because that was not the State's theory of the case. If, as the majority does, we assume that the State's theory was not that which was charged or argued to the jury, but instead was one of forced drowning, then there is other sufficient evidence to support drowning. The jury could have relied on either Shaibani or Ballanco for that determination. Even if the jury disregarded Shaibani's testimony all together, there still would be sufficient evidence upon which to convict. However, what is

---

[5] To ascertain the theories of the case, I rely primarily on the criminal complaint, opening statements, and closing arguments.

critical here is the fact that Shaibani single-handedly destroyed Plude's credibility by explaining to the jury why Plude's statements to the police could not be true. In a case such as this, the fact that Shaibani lied to the jury creates error.

¶ 62. The jury decided that Plude committed first-degree intentional homicide of his wife Genell. Shaibani's testimony was offered to rebut Plude's three versions of how he found Genell in the bathroom.[6] In other words, that testimony was offered to attack Plude's credibility. We know that the theories advanced by the parties related to whether Genell committed suicide by overdose or whether she was a homicide victim who was given a lethal dose of prescription medication. We, however, do not know whether the jury decided that Plude caused the overdose of his soon to be "separated-from" wife as urged by the State, or whether the jury found that he drowned her in the toilet, or whether the jury considered a combination of those acts. The jury did, nonetheless, conclude that Plude was guilty.

¶ 63. Because of Shaibani's testimony, the jury, rather than requiring the State to meet its burden of proof as to each element of the offense charged, may have concluded that since Plude cannot be believed, he must be guilty. However, Shaibani's testimony was relevant only as it related to the truthfulness of Plude's statements to the police, not as it related to a theory of guilt, which was neither forwarded by the State nor defended by Plude. As a result, I must depart from the majority's analysis.

---

[6] The circuit court concluded that Shaibani was utilized by the State "to contradict the defendant's inquest testimony that [Plude] found [the victim] with her face suspended in the water of the toilet bowl, suggesting death by suicide."

## B. Erroneous exercise of discretion

¶ 64. We must keep in mind that it is the circuit court that presided over this two-week trial and heard nearly 40 witnesses. The majority, however, concludes that the circuit court erroneously exercised its discretion even though the "newly-discovered evidence" theory relied on by the majority was not presented to the circuit court, and it is not even clearly before this court.[7] I would not conclude that the circuit court erroneously exercised its discretion because the theory relied on by the majority today was not squarely before the court, and it never decided the issue. Rather, Plude argued to the circuit court that, in light of Shaibani's misrepresentations, Shaibani was no longer qualified as an expert, he was a fraud on the court, and Plude argued the outdated doctrine of "falsus in uno."[8]

¶ 65. Specifically, Plude argued to the circuit court that the newly-discovered evidence rendered Shaibani's testimony inadmissible because he was no

---

[7] Plude does not make the argument that the majority relies on—neither to the circuit court nor to this court. In fact, Plude does not really assert a newly-discovered evidence theory to this court. Rather, Plude argues that this court should find a constitutional violation under *Giglio v. United States,* 405 U.S. 150 (1972); however, this court concludes no due process violation has occurred. Plude also argues that this court should adopt the *Daubert* standard, but this is not addressed by the majority.

[8] Falsus in uno doctrine:

" '[T]here is an old maxim 'falsus in uno, falsus in omnibus' (false in one thing, false in all), which is often much overemphasized by counsel, though it is recognized by many courts in their charges to the jury. But this is only primitive psychology, and should be completely discarded.' " John H. Wigmore, *A Students' Textbook of the Law of Evidence* 181 (1935).

*Black's Law Dictionary* 620 (7th ed. 1999).

longer qualified as an expert. Plude supported his newly-discovered evidence theory by arguing that as a result of Shaibani's misrepresentation, "Shaibani [was] not a qualified expert." Plude asserted:

[i]n light of the facts surrounding Mr. Shaibani's testimony and his false testimony supplied at trial, the court must grant a new trial.

. . . It is within the trial court's discretion to determine whether or not a person is qualified as an expert. *In re the Commitment of Larry J. Sprosty,* 248 Wis. 2d 480, 636 N.W.2d 213 (Wis. [Ct.] App. 2003).

¶ 66. The circuit court, however, specifically concluded that Shaibani, based on his experience, was still a qualified expert and stated, "[h]ere, there is no evidence that Dr. Shaibani's inaccurate testimony concerning his curriculum vitae makes his opinions unreliable. The Court allowed Dr. Shaibani to testify because of his experience in the field, prior work in this area, education and background, and not because he claimed to be a clinical professor at Temple University." In the State of Wisconsin, whether an expert is qualified has always fallen squarely within the discretion of the circuit court.

¶ 67. The circuit court acknowledged the State's stipulation that Shaibani misrepresented his status with Temple University, but the court stated, "[h]owever, there has been little else argued that Dr. Shaibani did not have the scientific, technical, or other knowledge to testify concerning the facts of this case that would assist the trier of fact." The circuit court concluded:

Given Dr. Shaibani's education, training, teaching background, and knowledge, the [circuit] [c]ourt al-

lowed Dr. Shaibani to testify, giving the jury the ability, as it must, to judge the value of and the credibility of the testimony. The defense has not suggested any facts other than the inaccurate curriculum vitae in question that was untrue or misleading to the jury.

¶ 68. The circuit court then concluded that Plude's reliance on *Sprosty* was misplaced and stated:

> Here, there is no evidence that Dr. Shaibani's inaccurate testimony concerning his curriculum vitae makes his opinions unreliable. The [circuit] [c]ourt allowed Dr. Shaibani to testify because his experience in his field, prior work in the area, education and background, and not because he claimed to be a clinical professor at Temple University. *No prejudice to the defendant has been shown, and I cannot grant a new trial based only on the one inaccuracy in Dr. Shaibani's curriculum vitae.*

(Emphasis added.) The circuit court did not erroneously exercise its discretion in making these findings, given what it knew.

¶ 69. In addition to arguing that Shaibani was not qualified to be an expert, Plude, relying on *Johnson v. Johnson*[9] and on *Sprosty,* argued that "Shaibani's testimony perpetrated a plain case of fraud upon the court, which in itself requires a new trial."[10] Plude asserted that because Shaibani perpetrated fraud upon the court —i.e., he misrepresented his credentials—all of his

---

[9] *Johnson v. Johnson,* 157 Wis. 2d 490, 497–98, 460 N.W.2d 166 (Ct. App. 1990).

[10] Plude argued fraud upon the court based upon what he asserted as (1) the State being constructively aware that Shaibani would give "expert testimony about something he really did not know about"; (2) the court relied on Shaibani's title to qualify him; and (3) the court relied upon Shaibani's testimony because no comparable witness existed.

testimony should be discredited. As stated above, the circuit court disagreed and concluded that despite the misrepresentations, Shaibani was still a qualified expert. However, the circuit court, in so ruling, did not know of the subsequent allegations that Shaibani had possibly falsified other qualifications.

¶ 70. Plude also argued to the circuit court that because Shaibani lied about one thing, he should be deemed to have lied about all things—i.e., he argued "falsus in uno." In Plude's post-conviction brief dated March 14, 2005,[11] he asserted that the jury's verdict should be set aside because "[n]ewly discovered evidence shows that the State's sole expert witness, Mr. Shaibani, testified in falsus in uno," i.e., false in one thing, false in all. Plude asserted this doctrine, even though the doctrine is outdated and its use has been highly criticized.[12]

¶ 71. The majority's decision today, may appear to revive the doctrine of "falsus in uno"—false in one thing, false in all—despite the fact that the doctrine fell out of favor long ago. *See* Falsus in Uno Wis JI— Criminal 305, Comment (stating that this instruction is not favored); *see also Black's Law Dictionary* 620 (7th ed. 1999) (citing to John H. Wigmore, *A Students'*

---

[11] He asserted three reasons to set aside the verdict, but this court has decided this case based on a newly-discovered evidence theory. Plude also alleged a discovery violation, and he alleged that when the circuit court ruled that the cause of death was an overdose, it ruled as a matter of law that the State failed to carry its burden.

[12] *See* Falsus in Uno Wis JI—Criminal 305, which states "USE OF THIS INSTRUCTION IS NOT FAVORED." *See id.* Comment (stating that "this instruction should not be routinely given" and is only appropriate where there is a sufficient evidentiary basis to show "there was willful false swearing").

*Textbook of the Law of Evidence* 181 (1935) (stating that the doctrine should be completely discarded)). I do not believe that it is this court's intent to revive the doctrine by its decision today, and I conclude that this doctrine should have no impact in this case.

¶ 72. In sum, I respectfully disagree with the majority's determination that the circuit court erroneously exercised its discretion when considering the arguments. The circuit court should not be required to search for arguments that are not presented, especially when competent counsel represents the defendant. In an oral decision on August 9, 2005, and a written memorialization of that oral decision filed on August 26, 2005, the circuit court properly exercised its discretion when considering the issues before it and the allegations made at that time. At the oral decision, the circuit court stated, "I would, [] note that at times [the] defendant used a shotgun approach for relief. I find only the three arguments addressed by the Court that were fully developed for review. I reject any other arguments not fully developed for review."

¶ 73. Today the majority concludes that the circuit court erroneously exercised its discretion because "[t]he circuit court did not evaluate whether a reasonable probability existed that a different result would be reached at a new trial if the jury knew Shaibani misrepresented his credentials."[13] Majority op., ¶¶ 30, 49. However, the circuit court did not consider whether

[13] It should be noted that generally in a case where a defendant was denied an opportunity to impeach a witness because the impeaching information was unknown at the time of trial, the witness in question is likely going to testify at the retrial. Thus, the defendant will have an opportunity to impeach that witness and the jury can properly consider the witness's testimony and the impeaching information. However,

a jury would come to a different result had it known Shaibani misrepresented his credentials because Plude never argued that to the circuit court. Thus, I depart from the majority and conclude that the circuit court did not erroneously exercise its discretion.

C. Newly-discovered evidence theory does not dictate reversal in this case

¶ 74. The majority concludes that if Plude knew that Shaibani was misrepresenting his status at Temple University, Plude could have impeached Shaibani and discredited his testimony, which, in the eyes of this court, gives rise to "a reasonable probability that a jury hearing of Shaibani's false testimony under oath would reach a different result." *See* majority op., ¶¶ 35, 37, 40, 46. However, even assuming that Shaibani was impeached and the jury disregarded everything he had to say, the jury would then have been in a position to weigh the remaining testimony against Plude's defense of how he came to find Genell, slumped over, face in the toilet, and that she committed suicide by overdose. How does the majority conclude that there would have been a different result with respect to the theory of the case advanced by the parties—Plude overdosed Genell? Why does the majority not engage in a sufficiency of the evidence analysis? From the decision today, it is unclear when a court should apply the newly-discovered evidence analysis, a *Sprosty* analysis, or a sufficiency of the evidence analysis.

¶ 75. In addition, what impact this newly-discovered evidence may have at a new trial calls for

in the case at hand, Shaibani likely will not even testify at a subsequent trial because his testimony was unnecessary in light of Ballanco's testimony.

speculation. Unlike most "newly-discovered evidence," where the new evidence would be introduced at a subsequent trial,[14] or go to an element of the offense, there is absolutely no assurance that Shaibani will testify at the new trial or that his misstatements will have any bearing on a new trial. Typically, newly-discovered evidence would have significant impact at a new trial. Here, however, the State could hire a new expert. The State may just conclude that Shaibani's testimony was cumulative and unnecessary. The State may decide it will not call someone who lied under oath. Clearly, the State had no idea that Shaibani presented

---

[14] *See, e.g., State v. Clarke,* 36 Wis. 2d 263, 279, 153 N.W.2d 61 (1967) (newly discovered testimony from a janitor that defendant was not the man he saw at the scene not sufficient to award a new trial because no reason to believe that the jury would have accorded more weight to janitor's testimony than that of the other eye witnesses); *State v. Chabonian,* 50 Wis. 2d 574, 584–85, 185 N.W.2d 289 (1971) (newly discovered evidence of the presence of an ornament in defendant's store, which would disprove his testimony that he never saw the missing ornament, not enough to warrant a new trial because a differ-ent result upon retrial not likely); *State v. Boyce,* 75 Wis. 2d 452, 457–63, 249 N.W.2d 758 (1977) (in theft by fraud prosecution, court did not abuse its discretion because the court concluded that expert testimony regarding handwriting analysis would not change the outcome of the trial); *State v. Bembenek,* 140 Wis. 2d 248, 251–58, 409 N.W.2d 432 (Ct. App. 1987) (polygraph examination that showed the defendant did not murder the victim would not be admissible at trial, so it does not constitute "newly discovered evidence" and jail-house confession also not admissible at trial so not type of "newly discovered evidence" that warrants a new trial); *State v. Eckert,* 203 Wis. 2d 497, 515–17, 553 N.W.2d 539 (Ct. App. 1996) (newly discovered eyewitness testimony as to defendant's whereabouts during homicide does not warrant a new trial because unlikely that it would lead to a different result).

false testimony until after the trial. Thus, the "newly-discovered evidence" here is really stale, impeachment evidence, which is not likely to be introduced at a new trial. The impact of this newly-discovered evidence at a new trial is speculative at best. On the other hand, the impact of Shaibani's testimony at the trial here, where it directly gutted Plude's credibility, is significant and quantifiable. If the jury believed Shaibani's injury mechanism analysis, they could not believe Plude.

¶ 76. Moreover, in order for evidence to qualify as "newly-discovered evidence," it must not be cumulative. To the extent that Shaibani's testimony relates to a likelihood of accidental drowning in the toilet, his testimony is cumulative because another expert witness, Julius Ballanco, essentially testified to the same information. In short, Shaibani's testimony is cumulative to that of Ballanco with respect to taking Dr. Huntington's testimony a step further.[15]

¶ 77. Specifically, Shaibani was not and is not a necessary trial witness because Ballanco testified at trial that a victim could not drown in a toilet without another person forcing the victim's face into the water. Therefore, even excluding Shaibani's testimony, a reasonable jury could still reach the same conclusion.

¶ 78. Moreover, Shaibani's testimony should be placed in context. The State's case-in-chief consisted of nine days of testimony beginning on December 3, 2002, and continued through three-quarters of the day on December 11, 2002. Shaibani testified on December 11, 2002, and, based on time stamps in the transcript, it likely encompassed less than two hours of testimony; his testimony consisted of approximately 63 pages out

---

[15] The State concedes that Dr. Shaibani is not cumulative. However, the State—in my view—inappropriately concedes that the newly-discovered evidence in this case was not cumulative.

of approximately 1,479 pages of trial testimony, not excluding discussions outside of the presence of the jury included in the transcripts. Shaibani was one of 35 witnesses that appeared during the State's case-in-chief, let alone the defense case. Shaibani was also briefly called during rebuttal in order to contradict the defense's expert in biomedical engineering, but this consisted of less than 30 pages of trial transcript.

¶ 79. As the court of appeals concluded, "there were multiple other pieces of evidence that would support Plude's conviction, diminishing any likelihood Shaibani's misrepresentation could have affected the jury's judgment."[16]

---

[16] The court of appeals wrote:

For example, Plude gave varying descriptions of the position in which he found Genell's body. Genell had an internal bruise on her neck, sustained while she was still alive, that could not be explained by CPR but was consistent with her neck being forced against the toilet rim.

Moreover, a "consulting engineer" who specialized in plumbing testified that the particular toilet in question is designed to prevent accidental drowning and that he knew of no case where an adult drowned in a toilet bowl absent force. He also estimated the volume of water displaced from the bowl. Because it contained vomit, it was evident the toilet had not been flushed, but the approximate one pint of displaced water was not explained by vomiting—something more forceful had to have caused the displacement. [State's] expert testified that, based on Plude's first version of how he found Genell, she could not have had her mouth and nose in the water.

Genell had planned to have her mother pick her up on the day of her death and was going to return with her mother to Minnesota. From there, Genell had planned to move to Texas. Her coworkers testified she was looking forward to a new life and had been secretly saving money for the move.

Plude exhibited unusual behavior the day of Genell's death. He evidently said to her, "I told you not to leave me." He then

¶ 80. In many ways, the majority decision today looks like it should undertake a sufficiency of the evidence analysis. Typically, when evaluating evidence as it relates to the ultimate conclusion of guilt, the court will look to see if there is other evidence to support the verdict. Here, the majority determines that Shaibani's testimony furthered the testimony of the State's pathologist, Dr. Huntington, as to the ultimate question of guilt. The majority reasons that if the jury knew of Shaibani's false credentials, the jury may not have convicted Plude. However, I am not so certain. Dr. Huntington did testify that it was more likely than not that the fluid in the victim's lungs came from the toilet bowl rather than from pulmonary edema. Majority op., ¶ 20. Shaibani did testify that "his experiments indicated to a reasonable degree of scientific certainty that Genell could not have inhaled toilet bowl water on her own," but rather that it would take 60 pounds of pressure to the back of Genell's head in order to get her face in the water and keep it there. Majority op., ¶ 25. Shaibani also testified that the laws of physics would not allow Genell to keep her face in the water without

checked with her supervisor about her last paycheck and insurance policy and later insisted that Genell be cremated immediately.

The crime scene was also quite clean despite approximately forty capsules of Fioricet having been opened. Genell's thumbprint was on only one capsule and the pill bottle. Plude's fingerprints were nowhere, despite his having used the Fioricet before.

Further, the computer searches that Plude claims are exculpatory are only minimally so. Whoever performed the search on Genell's computer only examined the first page of various results—no page with dosing information was ever displayed on the computer.

*State v. Plude,* No. 2005AP2311–CR, unpublished slip op., ¶¶ 46–51 (Wis. Ct. App. Mar. 6, 2007).

someone else forcing her face into the water. In other words, the testimony supported the notion that without assistance, the laws of physics would pull the unconscious person's head out of the toilet bowl and therefore, prevent drowning. This testimony, however, does not stand alone or unsupported.

¶ 81. If one could conclude that Shaibani's testimony took Dr. Huntington's testimony further and drove the conviction here, one could equally determine that it was the testimony of Ballanco that took Dr. Huntington's testimony further and drove the conviction. The record reveals sufficient evidence on that point. Like Shaibani, Ballanco testified that toilets are designed in such a way that a person cannot drown in a toilet unless someone else forces his or her face into the water.[17]

¶ 82. When asked whether drowning was a concern for the plumbing industry, Ballanco testified that it was a major concern. Ballanco stated:

---

[17] Julius Ballanco graduated from Stevens Institute of Technology with a degree in mechanical engineering fluid flow heat and power. He is a registered professional engineer in six states, holds a master plumbers license, teaches training programs across the country regarding codes and standards, and teaches plumbing engineering basics and advance plumbing engineering at Howlin Washington College. Mr. Ballanco participates in the design and development of toilets, has conducted extensive research regarding plumbing fixtures and safety of toilets, and serves on a number of committees such as those charged with developing new standards for toilets, regulating water quality, and regulating plastic pipes and fittings used in plumbing. In addition, Mr. Ballanco has been a guest speaker at the world plumbing conference, publishes columns every month for "PM Magazine," (plumbing and mechanical) and "PM Engineer" and has written seven books including "Ballanco on Plumbing."

Yes, drowning is. One of, one of the things that we [are] always evaluating is any time that you have a body of water there is potential for drowning. And one of the concerns with drowning is two fold. Small children, especially babies and also, [] we call the bar lounge outrageous restaurant phenomena where people tend to vomit in the water closet. And we don't want them to go in to vomit and then drown in the water closet if they passed out.

¶ 83. With regard to the particular model of toilet in this case, Ballanco testified that he was familiar with this toilet. He stated, "Yes, that is a Mansfield water closet. Mansfield is based in Ohio. Their chief engineer is a good friend, Burt Preston." Ballanco inspected this particular toilet and testified that this toilet, including the water level, was in compliance with all standards. In short, the toilet was working properly.

¶ 84. When asked whether this "bowl [was] designed to prevent both nose and mouth emersion [], without contortion," Ballanco testified:

It is not specifically designed. It is [a] secondary effect of the design so that the mouth and nose cannot come in contact if someone passes out. It is just the nature of how the bowl came into being. It is something that we look at. But, actually, it was because of other factors that, you know, that you get secondary effects from the primary design factors.

The prosecutor then asked:

Well, let's talk about that. If that person were to go unconscious, lets assume that person is a female between——approximately the age 28, weighed approximately 110 to 140 pounds, five foot eight in height, would it be possible for parts of that person's head or face, okay, to fall into the water and remain in that position unassisted?

[DEFENSE COUNSEL]: Objection [as to the unassisted part]. . . .

[THE COURT]: Yes, sustained.

[THE PROSECUTOR]: Having—removing the unassisted part of that hypothetical, could you give us an opinion to a reasonable degree of scientific certainty whether that could occur?

[MR. BALLANCO]: One could, if one passed out they could get their forehead and nose under water.

[THE PROSECUTOR]: Okay.

[MR. BALLANCO]: Not their mouth.

[THE PROSECUTOR]: Not their mouth?

[MR. BALLANCO]: Right.

¶ 85. The prosecutor subsequently asked Ballanco whether he had knowledge of "a single case of a person with [] their face suspended in the water of a water closet." Ballanco replied, "None." However, Ballanco did testify that there are cases in which someone has drowned in a toilet. He testified:

> [T]he typical cases we have are small children, babies falling in and drowning.
>
> . . . .
>
> Well, it happens when the bowl is not properly protected. And children do strange things. . . . They have a small enough body that they can fully submerge themselves. They don't have the shoulder width to block them out. . . .

¶ 86. However, when Ballanco was asked if he was aware of any adult cases of drowning, Ballanco testified

75

that he was not aware of any adult drowning cases. The prosecutor then asked Ballanco if he was aware of any adult drowning cases where force was used. Ballanco replied, "Yes." He testified: "[w]ell, unfortunately, there have been instances of somebody's head being held into the water closet and them drowning." The prosecutor then inquired what would be required for someone to drown in this toilet by use of force. Ballanco answered, *"if you held the head and put enough force behind, and of course you would have to hold it in place all the way down in the water, you can get the head completely submerged in water and the nose and mouth completely covered."* (Emphasis added.)

¶ 87. The prosecutor then asked Ballanco, through a series of questions, whether this particular toilet contained a device known as a "trap." Ballanco replied that this toilet does have a "trap" and he explained:

> If you put a mass in the bowl or in any trap, what happens is that you're exerting a force and water being a fluid it will move on both sides. And once you put a mass in there the water will start to flow over the weir of the trap on the opposite side. And that will in effect lower the water level in the trap when the mass is removed.

The prosecutor then showed a crime scene photo of the toilet to Ballanco, which Ballanco had also viewed in preparation for his testimony, and the prosecutor asked if there was anything about this "photograph in relation to water displacement." Ballanco testified:

> [W]hat I noticed is, if you look at that photograph, there is a mark in the water or on the tank on the bowl, excuse me, and in the back of the bowl. That would indicate the normal water level. Because what happens is the water leaves that in an unclean bowl, actually starts to form a line. And most people understand that they experience that in their life.

Um, what you see on this bowl is the water, itself, in the bowl is, I estimate, approximately a quarter of an inch below that level. So the water level had dropped.

Ballanco then testified to a reasonable degree of scientific certainty that approximately 16 ounces of water had been displaced from the toilet.

¶ 88. Accordingly, regardless of whether the laws of physics will allow someone's head to remain inside the toilet once unconscious, a person still could not drown in a toilet because the toilet design precludes drowning unless force is used. If Shaibani's credentials were discredited at trial, the parties or the court could have asked the jury to disregard his testimony entirely. However, the State still could have secured a conviction, if drowning was its theory based upon Mr. Ballanco's testimony and Dr. Huntington's testimony.

¶ 89. One could easily conclude that Shaibani's testimony regarding forced drowning was not useful at all, given Ballanco's testimony that the toilet bowl design prevents drowning absent another person forcing a victim's face into the water. However, it is Shaibani's testimony regarding injury mechanism analysis that picked apart the credibility of Plude's statement to the police and the jury did not know that Shaibani had lied to them. The relevancy of Shaibani's testimony most directly bears on Plude's credibility, rather than on the theory of conviction, and on that score, it is not cumulative.

D. Precedent governing a deceitful expert

¶ 90. While misrepresenting one's credentials is extremely troubling, decisions from appellate courts in this state and others have not automatically ordered a new trial upon the discovery that an expert falsified his

or her credentials. If this precedent is to change in this state, we should clearly articulate the rule of law. I point out that this decision may be viewed as contrary to precedent and could create confusion to the lower courts, which must apply the analysis.

¶ 91. I would distinguish this case from other Wisconsin precedent because Shaibani was not called to testify about evidence that established an element of the offense. Rather, he was called to refute the credibility of the statements that Plude gave to the police. How do we know that? The theory of the State's case was based on whether Plude caused Genell to overdose, and the defense's theory was that she overdosed on her own; the fundamental issue was not whether she drowned. The fluid in her lungs was apparently never even tested. Why not? Presumably, it was not tested because the State's theory was not that she drowned, but rather, that she was administered an overdose by Plude.

¶ 92. The sufficiency of the evidence, however, is not discussed by the majority. The majority leaves uncertainty as to when a court should engage in a newly-discovered evidence analysis, instead of a sufficiency of the evidence analysis. When should a court undertake the analysis of *Sprosty*? We cannot be sure. Instead, the majority relies on a newly-discovered evidence theory, as it relates to a theory not advanced by the parties. Without clearly explaining why, and in so doing, it transcends Shaibani's testimony from that which related to Plude's credibility, to that which dictated a finding of guilt by forced drowning. If the majority concludes that Shaibani's testimony relates to an element of the offense, it ought to also discuss sufficiency of the evidence. To me, it is because Shaibani's testimony was a direct attack of Plude's truthfulness, in this circumstantial case where credibil-

ity was critical, that the sufficiency of the evidence analysis does not save the verdict. Simply stated, unlike in *Sprosty,* other sufficient evidence as to the elements of the offense do not reinstate the defendant's credibility.

¶ 93. In *Sprosty,* our court of appeals concluded that even though the State's expert had given inaccurate testimony regarding his job titles and the length of time that he held a particular job, reversal of the commitment order was not required. *In re Commitment of Sprosty,* 2001 WI App 231, ¶¶ 27–33, 248 Wis. 2d 480, 636 N.W.2d 213. The expert testified about sexually violent persons and whether Sprosty should be placed on supervised release. *Id.,* ¶¶ 10, 28. Sprosty argued that the expert:

> (1) lied about his credentials, which was contrary to the ethical standards of the American Psychological Association, and had been terminated from his current position because of it; (2) lied about the circumstances surrounding his termination from a former job; (3) altered two Wis. Stat. ch. 980 reexamination reports (unrelated to Sprosty) without knowledge of the original authors; and (4) made an unauthorized deposit of state money.

*Id.,* ¶ 31.

¶ 94. Nonetheless, the court of appeals concluded that the expert was still qualified and that his testimony was not incredible as a matter of law. *Id.,* ¶ 32. The court reasoned that the misrepresentations did not undermine the expert's basic qualifications to give an expert opinion, and moreover, his opinion was corroborated by another expert. *Id.* Accordingly, the commitment order was upheld. In other words, even though the expert's credentials were inaccurate, that was not enough to require a new trial in *Sprosty.*

¶ 95. Similarly, in *Ricco v. Riva,* the court of appeals concluded that even though the expert misrepresented his credentials, his testimony was not incredible as a matter of law. *Ricco v. Riva,* 2003 WI App 182, ¶¶ 13–17, 266 Wis. 2d 696, 669 N.W.2d 193. The expert improperly referred to himself as a "Master Home Inspector" and that he was a graduate of the Milwaukee School of Engineering. *Id.,* ¶ 5. The expert testimony was used to establish that the homeowners knew or should have known that there was a defect. *Id.,* ¶ 7. The court stated, while the expert's "claims regarding some of his credentials are suspect and likely untrue," he was still a qualified expert because he was a " 'licensed home and building inspector,' who has 'inspected thousands of homes in the Milwaukee area,' and [] he is 'familiar with construction standards, building defects, and problems relating to home construction.' " *Id.,* ¶ 16.

¶ 96. The court of appeals concluded that "[i]f the more aggravated conduct in *Sprosty* did not warrant striking the expert witness's testimony, it surely follows that the conduct in this case does not warrant that sanction." *Id.* The court of appeals reasoned:

> We share the trial court's concerns about [expert] Wantz playing fast and loose with his qualifications. But we part ways with the trial court on its holding that Wantz's specious claims about his credentials render his testimony incredible as a matter of law. In order to make that statement, we would have to hold that Wantz's testimony would be in conflict with the uniform course of nature or with fully established or conceded facts. Wantz's inflated estimation of himself and his credentials, while obnoxious to us, does not satisfy this test. The weight and credibility to be given to the opinions of expert witnesses are uniquely within the province of the fact finder. Here, as in *Sprosty,* Wantz's misleading testimony as to certain of his quali-

fications does not render his opinion as to defects in the
Riccos' property incredible as a matter of law.

*Id.,* ¶ 17 (citations omitted). Again, despite an expert
making untrue representations as to his qualifications,
the court of appeals did not reverse.

¶ 97. Precedent outside of Wisconsin has been
consistent with *Sprosty* and *Ricco.*[18] Accordingly, appel-
late courts in this state and others, as well as federal
courts, have not automatically reversed convictions or
orders because an expert witness misrepresents his or
her credentials, especially when the expert's testimony
is corroborated by other evidence. If this precedent is to
change, this court should clearly articulate the new rule
of law.

---

[18] *State v. Glouser,* 226 N.W.2d 328, 331–32 (Neb. 1975)
(concluding that the newly discovered evidence that the expert
lied about his degree and training was not sufficient to establish
that a different result would have occurred if the expert could
have been discredited; the expert was still a qualified expert);
*Stevenson v. State,* 473 A.2d 450, 451, 453 (Md. 1984) (conclud-
ing that even though newly discovered evidence established
that the expert lied about graduating from the Illinois School of
Technology, his false testimony was not material to the outcome
of the case because the evidence of guilt was overwhelming and
thus the conviction was upheld); *People v. Yoli,* 541 N.Y.S.2d 609
(A.D.2d 1989) (concluding that even though newly discovered
evidence established that the expert lied about his credentials in
other trials, a new trial was not warranted because the testi-
mony was cumulative, would have only impeached the credibil-
ity of the witness, and he did not falsify his credentials in this
case); *People v. Irvin,* 580 N.Y.S.2d 388, 389–90 (A.D.2d 1992)
(concluding that no reason to vacate judgment even though the
expert, who linked the saliva and semen to the defendant, lied
about his educational background; there was overwhelming
evidence of the defendant's guilt and the forensic evidence was
merely cumulative and inconsequential); *Correll v. State,* 698
So. 2d 522, 525 (Fla. 1997) (newly discovered evidence that blood

## E. Circuit court's role in evaluating expert testimony

¶ 98. The majority's decision today may seem to call into question the circuit court's role in evaluating expert testimony. The majority opinion essentially concludes that Shaibani cannot be deemed an expert—despite the fact that the circuit court decided that he still was an expert. In this state, circuit court judges have always been vested with great discretion in determining the admissibility of expert testimony.[19] If we are adopting a standard more consistent with *Daubert*,[20]

spatter expert misstated her credentials was purely collateral because even if her credentials were diminished, she still would have qualified as an expert); *People v. Drake,* 684 N.Y.S.2d 102 (A.D.4th 1998) (concluding that even though newly discovered evidence established that the expert lied about his credentials, there is no reasonable probability that the verdict would have been different had the evidence been available to the defendant and used to impeach the expert); *Howard v. State,* 945 So. 2d 326, 370–71 (Miss. 2006) (concluding no reasonable likelihood that the false statements made by the expert affected the judgment of the jury because the statements concerned the expert's background and competence as an expert and were not to his ultimate conclusions that the defendant's dental molds matched the bite marks on the victim); *United States v. Price,* 357 F. Supp. 2d 63, 68–69 (D.D.C. 2004) (concluding that even though the detective lied when stated he was a board certified pharmacist, the § 2255 motion was denied because his testimony was based on his experience with the street narcotics trade rather than experience potentially gained as a pharmacist).

[19] For a thorough treatment of expert testimony in the state of Wisconsin and a consideration of the *Daubert* standard, *see* 7 Daniel D. Blinka, *Wisconsin Evidence* §§ 702.1–702.4 (West Supp. 2007); *id.* at § 702.3 (discussing the *Daubert* standard); *see also* Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of Daubert,* 90 Marq. L. Rev. 173 (2006).

[20] *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, (1993).

which focuses on the reliability of an expert, instead of the circuit court's gatekeeper function in determining relevancy, we should so specifically state. I write to point out that the majority's decision may appear to diminish a circuit court judge's discretionary authority to decide the admissibility of expert testimony.

## III. CONCLUSION

¶ 99. An expert who misrepresents his or her credentials is reprehensible, and I do not condone such behavior. This concern is particularly valid when that expert's purpose is to defeat the credibility of a defendant in a circumstantial case wherein credibility is critical. If Shaibani had not lied, this case would not be on review at the supreme court and justice would not be delayed or denied. Here, the majority points out that Plude may not have received a fair trial because a critical witness lied. I am not so convinced that this witness was critical to any element of the offense, but once he was introduced as a witness to attack Plude's credibility, his lies became critical.

¶ 100. Fairness is fundamental to our system of justice. While I concur with this court's result, I do so pointing out that this decision potentially conflicts with precedent and longstanding jurisprudence. I do not conclude that the circuit court erroneously exercised its discretion; rather, it applied the law to the known facts and the arguments. I am concerned that the majority decision convolutes the distinction between an expert who testifies about an element of the offense versus an expert who is called to refute the defendant's credibility. The decision today does not provide clear direction as to how a court should analyze this issue in the future. Clearly the misrepresentation of an expert's credentials is extremely troubling, but decisions from appellate

courts in this state and others have not automatically reversed a conviction upon the discovery that an expert falsified his or her credentials—even if that witness was important to the trial and especially when that testimony is corroborated by other evidence.

¶ 101. While I join in the decision today because of the egregious behavior of this expert, who was directly called to rebut the credibility of the defendant, I point out that the majority opinion may create uncertainty in its application.

¶ 102. Accordingly, I respectfully concur.