DUGAN, J.,
¶1 Andre L. Thornton appeals a judgment of conviction, following a jury trial, for one count of first-degree reckless homicide, as a party to a crime. He also appeals the order denying his postconviction motion.
¶2 Thornton argues that the trial court erroneously exercised its discretion when it denied his motion for a new trial based on newly discovered evidence that one of the State's witnesses had perjured himself ten years earlier in a federal court proceeding. We disagree and affirm because we conclude that the trial court properly determined that the proffered impeachment evidence did not create a reasonable probability that had the jury heard the new evidence that the result of the trial would be different.
BACKGROUND
The incident
¶3 Thomas Wilson was shot and died after the second of two confrontations with Thornton during the early morning hours of October 31, 2015. The confrontations related to Wilson's desire to see his child, who lived with her mother, Corrina Williams, Thornton's girlfriend.
¶4 The first confrontation began when Wilson drove to the 6300 block of West Carmen Avenue in Milwaukee where Williams lived and encountered Thornton. Wilson drove away and Thornton and other men followed in a vehicle. Gunshots were fired from one or both of the vehicles when the two vehicles were near each other on Silver Spring Drive. The confrontation ended and Thornton returned to Williams' apartment.
¶5 The second confrontation between Thornton and Wilson occurred when Wilson drove back to Williams' apartment. Thornton was at Williams' apartment with some of the men who had been with him in the vehicle that followed Wilson. Gunshots were fired from Wilson's car and from Williams' apartment building. At about 3:50 a.m., police responded to the report of a shooting in the 6300 block of West Carmen Avenue. The police found Wilson in his car with a gunshot wound in his back, unconscious, and bleeding heavily, two blocks from Williams' apartment.
The charges and trial
¶6 On February 1, 2016, the State charged Thornton with first-degree reckless homicide with use of a dangerous weapon as a party to a crime. The matter proceeded to a six day jury trial that began on October 24, 2017. At trial, several eyewitnesses described what occurred during the first and second confrontations and presented different versions of the confrontations. Detectives Timothy Keller, Nathan Butz, Shelondia Tarver, Jason Enk, and Timothy Graham also testified about statements that the witnesses made to the police.
Corrina Williams
¶7 Corrina Williams testified that she had a relationship with Thornton and that he was with her at the apartment on October 31, 2015. Williams had given multiple statements to the police, but she remembered very few details about what she told them.
Detective Timothy Keller
¶8 Detective Keller testified about statements that Corrina Williams made to him on November 1, 2015. She told the detective that Thornton noticed Wilson driving near Williams' apartment on October 31, 2015, that Thornton and Wilson had a confrontation, and that Wilson drove away. Thornton then tried to follow Wilson, gunshots were fired, and Thornton lost track of Wilson. Thornton returned to Williams' apartment with a long black and brown gun. He stood watch at a window, saw Wilson, and left with the gun. Williams then heard numerous gunshots coming from outside the apartment building. Thornton came back into the apartment and said that he told Wilson not to come back and said, "I think they got him." Williams also told police that Thornton actually said, "I think I got his ass."
Richard James
¶9 Richard James testified that he saw Thornton confront Wilson the first time Wilson was near Williams' apartment. He drove the car that followed Wilson's car with Thornton, Jamaul Jones, Justin Speed, and James Pate in the car. He caught up with Wilson on Silver Spring Drive and he thought some shots were fired from Wilson's vehicle.[1] After the shots were fired, Wilson turned off Silver Spring Drive, and James drove back to Williams' apartment and dropped Thornton off. Next, James dropped off Jones, Speed, and Pate at Jones' residence, and then he went home. Later, Thornton called him stating that Wilson had returned to the area with others and that Jones and Speed were coming back. James did not go back.
¶10 The State asked James about his prior statement to the police that Thornton told him that Speed was bringing an AK-47 assault type rifle with him. James did not recall making that statement. However, James recalled that he told a detective that Speed told him that he brought his AK-47 to Williams' apartment and that Pate had used it to shoot at Wilson's car.
Jamaul Jones
¶11 Jamaul Jones, Thornton's brother, testified consistently with James regarding the events leading up to the first shooting.[2] Jones then got a call from Thornton that Wilson had returned to Williams' apartment building and had a gun. Jones drove back to the apartment with Pate and Speed. Speed had a black AK-47 with him. Jones dropped Pate and Speed off at the apartment building, and Pate and Speed entered the building. Speed was carrying the AK-47.
¶12 Then, Wilson's vehicle drove directly in front of Williams' apartment building. An arm holding a gun reached out of the sunroof of Wilson's car and started shooting at the building. Jones then heard "loud return fire," but he could not see the source. Wilson's car then drove east on Carmen Avenue. Then Pate and Speed left the apartment building and got into Jones' car. Pate was carrying the AK-47 and gave it to Speed. Jones heard Speed ask Pate why he shot at the car because it was not his fight.
Justin Speed
¶13 Justin Speed also testified fairly consistently with James and Jones about the events leading up to the first shooting and the circumstances that brought them back to Williams' apartment. He added that Thornton and Pate were in Williams' apartment talking, and Thornton said there would be problems if Wilson came back. Both he and Thornton had their guns sitting on the kitchen table. When Wilson returned to the area, Thornton grabbed his gun and Pate grabbed the AK-47. Speed saw Pate shoot the AK-47 out of a window. They went downstairs and Speed heard more shots fired outside, but could not see the shooter.
¶14 The State asked Speed about his prior statement to the police that Thornton grabbed both guns from the kitchen table and then went to the hallway window, and shot out of the window with the AK-47. Speed did not remember making that statement.
Detective Shelondia Tarver
¶15 Detective Shelondia Tarver testified that James told her that Pate and Speed told him that Thornton shot Wilson's car.
Detective Jason Enk
¶16 Detective Jason Enk testified that Speed said that he saw Thornton with the AK-47 and saw Thornton shoot at the car more than five times, and that Thornton said, "I shot the car up." Also, Detective Enk testified that Speed said that Pate gave the AK-47 to Thornton as they were exiting the front door of the apartment. Detective Enk also testified that Jones told him that Thornton had the AK-47 and that he passed it on after the shooting, and that Thornton said, "I got his bitch ass."
Detective Nathan Butz
¶17 Detective Nathan Butz testified that Speed said that he heard shots, and when he ran out, he saw Thornton holding the AK-47. Thornton was the only person outside at the time of the shooting.
Detective Timothy Graham
¶18 Detective Graham also testified that Speed told him that he saw Thornton take the AK-47 and shoot several times.
Bradley Lee
¶19 Bradley Lee testified that he met Thornton when they were housed in the same jail pod, and that Thornton told him the details of Wilson's murder, including the fact that he shot at Wilson's car with the AK-47. He also testified that he had ten prior criminal convictions and he had entered into a plea agreement to three counts of forgery, where the State would be recommending a combined sentence of eleven years of imprisonment, consisting of sixty-six months of initial confinement and sixty-six months of extended supervision. Although neither the police nor the district attorney had entered into any agreements with him or made any promises to him, Lee hoped that providing the information and testifying at trial would result in reduced charges or leniency in his case.
Jury instruction and question from the jury
¶20 The trial court instructed the jury on guilt as a party to a crime. During deliberations, the jury asked:
If we come back with a verdict of guilty but say "No" to the use or possession of a dangerous weapon (990)[3 ] does that automatically infer that the defendant is then a party to the crime by aiding and abetting? (Because it does not reference this on the verdict form.).
After conferring with the parties, the trial court provided the jury with a new verdict form that separated the first-degree reckless homicide charge as a party to a crime from committing that crime using a dangerous weapon.
The verdict and sentencing
¶21 The jury found Thornton guilty of first-degree reckless homicide as a party to a crime, but found him not guilty of committing that crime while using a dangerous weapon. At sentencing, the trial court imposed a twenty-eight year sentence, consisting of eighteen years of initial confinement followed by ten years of extended supervision.
Postconviction motion
¶22 Thornton filed a postconviction motion, arguing that evidence that ten years earlier Lee had committed perjury during a federal court proceeding was newly discovered evidence requiring a new trial. Thornton argued that a new trial was necessary because Lee was the only witness who testified that Thornton shot Wilson. The trial court ordered the parties to brief the motion. In an April 18, 2018 written decision, the trial court denied the motion without a hearing. This appeal follows.
DISCUSSION
¶23 Thornton asserts that the trial court erroneously exercised its discretion when it denied his motion for a new trial based on the newly discovered evidence that Lee had perjured himself ten years earlier in a federal court proceeding.
I. Standard of review
¶24 The decision to grant a motion for a new trial based on newly discovered evidence is committed to the trial court's discretion. State v. Avery , 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60. We review the trial court's determination for an erroneous exercise of discretion. See id. A trial court erroneously exercises its discretion when it applies an incorrect legal standard to newly discovered evidence. See State v. McCallum , 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997). Furthermore, we do not set aside the trial court's finding of fact unless clearly erroneous. See WIS. STAT. § 805.17(2) (2017-18)[4] (made applicable to criminal proceedings by WIS. STAT. § 972.11(1) ).
¶25 To be entitled to a new trial based on newly discovered evidence "a defendant must prove: '(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.' " State v. Plude , 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted). "If the defendant is able to prove all four of these criteria, then it must be determined whether a reasonable probability exists that had the jury heard the newly[ ]discovered evidence, it would have had a reasonable doubt as to the defendant's guilt." Id.
¶26 "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." Avery , 345 Wis. 2d 407, ¶25. "A court reviewing the newly discovered evidence should consider whether a jury would find that the evidence 'had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt.' " Id. (citation omitted). "This latter determination is a question of law." See Plude , 310 Wis. 2d 28, ¶33.
II. The trial court properly exercised its discretion in concluding that the proffered impeachment evidence did not establish a basis for a new trial
¶27 Thornton argues that the trial court erroneously exercised its discretion in concluding that the new evidence did not create a reasonable probability that had the jury heard the new evidence that the result of the trial would be different. He argues that contrary to the trial court's finding, there was no evidence that Thornton said, "I got his bitch ass." He also argues that the trial court did not account for the fact that eyewitnesses testified that Pate was the shooter.
¶28 Thornton's arguments ignore the trial court's findings of fact and its conclusions of law. As we will explain, those determinations are not clearly erroneous and therefore must be upheld.
The impeachment evidence that Thornton offers does not provide a basis for a new trial
¶29 The trial court concluded that Lee's perjured testimony in an unrelated federal proceeding that occurred more than ten years before Lee testified in Thornton's trial was at most impeaching only in character, which is generally insufficient for a new trial. The trial court noted that unlike Plude , 310 Wis. 2d 28, ¶49, where it was shown that the verdict was based on perjured evidence, Thornton had not shown that Lee lied on the witness stand in Thornton's trial. He merely sought to raise that inference based upon Lee's perjured testimony in an unrelated federal proceeding that had occurred more than ten years before he testified at Thornton's trial.
¶30 We agree with the trial court's holding that Lee's perjured testimony was offered merely to impeach Lee's credibility. Further, we note that the discovery of new evidence that merely impeaches credibility of a witness is not a basis for a new trial on that ground alone. See Greer v. State , 40 Wis. 2d 72, 78, 161 N.W.2d 255 (1968). Thornton does not argue that evidence that Lee perjured himself in the federal proceeding is material for any reason other than to impeach Lee's credibility. Accordingly, we conclude that he has failed to establish that this evidence satisfies the criteria for a new trial.
There is no reasonable probability of a different result if the jury heard the new evidence
¶31 Furthermore, we agree with the trial court's holding that there is no reasonable probability that a different result would be reached in a new trial. First, we agree with the trial court's finding that trial counsel effectively impeached Lee. The trial court found that the record reflected that trial counsel had effectively impeached Lee's credibility by attacking him with evidence of his ten prior convictions, and suggesting a motivation to lie in order to better his own circumstances at his upcoming sentencing on his three counts of forgery. Additionally, the trial court relied on the fact that the jury had found Thornton not guilty of committing the crime while using a dangerous weapon, concluding that the jury had rejected Lee's testimony that Thornton was the one who shot Wilson. In other words, the jury apparently did not believe Lee's testimony that Thornton admitted shooting Wilson with the AK-47. Therefore, the additional fact that Lee perjured himself in the federal proceeding was not necessary to convince the jury that it should not believe Lee-it reached that conclusion without that evidence.
¶32 The trial court's finding is supported by the record and, therefore, is not clearly erroneous. As noted, during deliberations, the jury asked, "If we come back with a verdict of guilty but say 'No' to the use of a dangerous weapon ... does that automatically infer that the defendant is then a party to the crime by aiding and abetting?" Then, it returned the verdict, which found Thornton not guilty of using a dangerous weapon, even though it found him guilty of first-degree reckless homicide, as a party to a crime. The jury's verdict and its prior question support the inference that it discounted the evidence that Thornton was the shooter.
¶33 Regardless, we conclude that there is no reasonable probability that a different result would be reached in a new trial. There was more than sufficient evidence, apart from Lee's testimony that Thornton admitted shooting Wilson, to convict Thornton as a party to the crime of the shooting. Thornton argues that the trial court did not describe any of the supposed substantial direct and circumstantial evidence of Thornton's guilt other than evidence that Thornton stated to witnesses after the shooting, "I got his bitch ass." He asserts that no witnesses testified that Thornton made that statement. He is mistaken.
¶34 Although Jones denied telling the officers that Thornton stated, "I got his bitch ass," the State called Detective Butz who testified that, in fact, Jones had stated that it was Thornton who made the statement. Therefore, the trial court properly referenced the testimony and Thornton's argument falls to the wayside. We also note that Detective Keller testified that Williams told him that Thornton said, "I think I got his ass." Williams' version of the statement is additional evidence of Thornton's guilt.
¶35 Thornton also argues that there is no other direct evidence that Thornton was the shooter except Lee's testimony. Again, Thornton is mistaken. There was testimony from Detectives Tarver, Enk, Butz, and Graham regarding statements made by Speed, Jones, and James that Thornton was the shooter.
¶36 Thornton cites no authority for his argument that prior inconsistent statements, though they may be taken as substantive evidence, "are hardly substantial and direct evidence." As Thornton acknowledges, prior inconsistent statements can be used as substantive evidence, as they were here. See Vogel v. State , 96 Wis. 2d 372, 386, 291 N.W.2d 838 (1980). Thornton is merely arguing with the trial court's interpretation of the evidence. He then concludes that for this additional reason, the decision of the trial court represents an erroneous exercise of discretion. This argument is not developed and he cites no authority to support it. We decline to further address it. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). See also Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 (stating "[a]rguments unsupported by legal authority will not be considered, and we will not abandon our neutrality to develop arguments" (internal citations omitted)).
¶37 Moreover, the argument is a red herring. As stated, the jury did not find Thornton guilty of being the shooter. Although the jury found Thornton guilty of first-degree reckless homicide, it did so as a party to a crime, not on the grounds that he was the shooter. It answered the verdict question by stating that Thornton did not commit the crime while using a dangerous weapon. Therefore, it is not relevant whether any other witness testified that Thornton was the shooter.
¶38 Based on the foregoing, we conclude that the trial court could reasonably find that Lee's testimony was not critical to the State's case. Moreover, as noted, the jury did not rely on Lee's testimony. It did not find that Thornton was the shooter, but rather, found that he was guilty only as a party to the crime of first-degree reckless homicide. We conclude that there is no reasonable probability that had the jury heard that Lee had perjured himself in a federal proceeding, it would have had a reasonable doubt as to Thornton's guilt.
CONCLUSION
¶39 For the foregoing reasons, we conclude that the trial court properly exercised its discretion when it denied Thornton's motion for a new trial based on newly discovered evidence. Therefore, we affirm the judgment and order.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

When he was interviewed by the police, James said that Thornton had shot at Wilson's vehicle when they were following it and that Thornton was "a fool for shooting out of the vehicle." James testified that he did not remember making that statement. However, he remembered Pate or Speed saying that "Dre is a fool." "Dre" is Thornton's nickname.

Jones told the police that Thornton had fired shots at Wilson's vehicle when they had followed it.

The number "990" in the jury's note refers to Wis JI - Criminal 990, " using or possessing a dangerous weapon - [ Wis. Stat. ] § 939.63."

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.