COURT OF APPEALS
DECISION
DATED AND FILED

**January 19, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP175-CR**

Cir. Ct. No. 2016CF226

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JUSTIN JAMES DOOLITTLE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Douglas County: KELLY THIMM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Justin Doolittle appeals a judgment of conviction, entered following a jury trial, for one count of second-degree sexual assault by use

of force and one count of incest. He also appeals an order denying postconviction relief. Doolittle argues that his trial attorney was ineffective by: (1) pursuing an objectively unreasonable trial strategy; (2) failing to adequately cross-examine witnesses and present evidence; and (3) erroneously advising Doolittle to waive his right to testify and effectively forcing that waiver by presenting a "false" defense. Doolittle also contends that he is entitled to a new trial in the interest of justice. Finally, Doolittle asserts that this court erred by denying his motion to stay his appeal and remand this matter to the circuit court for Doolittle to present additional evidence in support of his postconviction motion, and by denying his motion to reconsider the denial of his motion to remand. We reject each of Doolittle's arguments and affirm.

## BACKGROUND

¶2      Doolittle's aunt, Denise,[1] testified at trial that Doolittle sexually assaulted her inside her camper at a private campground in Wascott, Wisconsin, during the early morning hours of June 29, 2016. Denise testified that at around 10:00 or 10:30 p.m. on June 28, she met up with Doolittle, her niece Kim Loftus, and Kim's husband Josh Loftus at the campground's bar. After drinking at the bar until 1:30 or 2:00 a.m., Denise invited Doolittle, Kim, and Josh to her camper. They continued talking and drinking at the camper for about an hour. Denise testified that Kim and Josh then left the camper, and "right after them, [Doolittle] was out the door within a minute."

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim in this case. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶3 Denise then started getting ready for bed, but after three to five minutes, Doolittle knocked on the camper's door and stated that he had forgotten something. Denise let Doolittle into the camper and asked what he was looking for, but he did not respond. She then told him that he needed to leave, at which point he stated, "You want me, bitch." Denise again told Doolittle to leave. He then pushed her, causing her to fall backward, landing on her back and hitting her head.

¶4 Denise testified she believed that she lost consciousness for a minute or two after hitting her head, and when she came to Doolittle was on top of her, pulling off her pants and saying "You want me," "You like this," and "You want me, bitch." Denise tried to push Doolittle off while yelling at him to stop and reminding him that she was his aunt. Doolittle then pulled both of her arms above her head, and she continued trying to push him off with her legs, but she was unable to do so. At that point, Denise's pants were off, and Doolittle forced his penis into her vagina.

¶5 Denise testified that Doolittle continued to have sex with her for about three to five minutes, while she resisted and repeatedly yelled at him to stop. After the assault, Doolittle told Denise, "If you fucking tell anybody, I'll kill you, bitch." Denise then fled the camper and ran to the residence of the campground owners, the Podgoraks, screaming for help as she ran. When she arrived at the Podgoraks' home, she pounded on the door and screamed for help.

¶6 Elizabeth and Henry Podgorak confirmed at trial that sometime after midnight on June 29, 2016, they heard Denise pounding on their door and screaming. Denise was wearing only a t-shirt and was naked from the waist down. She was very upset and told the Podgoraks that Doolittle had raped her.

¶7      The Podgoraks called 911, and Henry then went to look for Doolittle and found him asleep in a bed in Denise's camper. When the police arrived, they placed Doolittle in a squad car. As Doolittle sat in the back seat, one of the officers noticed what looked like fresh rug burns on both of his knees. Doolittle was transported to jail, and his clothing was collected as evidence.

¶8      Sheriff's Deputy Patrick Carey testified that when he spoke with Denise at the campground, she was "hysterical, crying, frantic, sweating profusely, [and] physically taking hold of her brother Robert," who is Doolittle's father and who was also staying at the campground that night. Denise was taken to a local hospital, where she was examined by an emergency room physician. The examination revealed a 0.5-centimeter abrasion along Denise's vaginal wall. The physician testified that injury was consistent with the sexual assault that Denise had reported. The physician conceded that the injury could have been caused by consensual sexual intercourse, but she testified that was not likely. The physician also observed bruising on Denise's arms. She swabbed various areas of Denise's body to collect potential evidence. Denise's clothing was also collected as evidence.

¶9      Kevin Scott, a DNA analyst from the Wisconsin State Crime Laboratory, testified regarding biological testing that he performed on various items of evidence in this case. Scott testified that an autosomal STR DNA profile matching Denise was found on the interior front and exterior front of Doolittle's shorts, as well as on the lower front of his t-shirt.[2] Doolittle's autosomal DNA

---

[2] Scott explained that with the exception of identical twins, every human being has a unique autosomal STR DNA profile.

was discovered on a blanket recovered from the bed in Denise's camper and on a swab from a red stain on the camper's carpet, which tested positive for blood. Scott also testified that a Y-STR DNA profile ("Y-profile") matching Doolittle was found on the inside crotch of Denise's shorts and on swabs taken from her abdomen and thighs.[3]

¶10    Scott further testified that he used a p30 protein test to detect the possible presence of semen on various items.[4]  Scott's testing detected p30—and, therefore, the possible presence of semen—on the swabs taken from Denise's vagina, cervix, perineum, lower abdomen, and thighs, as well as on the blanket from Denise's bed and the front of Doolittle's t-shirt.  Scott did not find sperm cells in any of the areas where the p30 test revealed the possible presence of semen.  He explained that without sperm cells, semen does not contain any DNA.

¶11    Doctor Mark Jungck testified that he performed a vasectomy on Doolittle in March 2013.  Jungck testified that a vasectomy blocks sperm from entering the urinary tract, but it does not affect the patient's ability to ejaculate. Jungck also testified that there were no complications during Doolittle's surgery, and he had every reason to believe that the procedure was successful.

¶12    Attorney Richard Gondik served as Doolittle's lead defense attorney at trial.  Attorney Christine Funk assisted Gondik in addressing the biological

---

[3] Scott explained that a Y-profile considers only male DNA and is not unique to a particular individual.  For instance, Scott testified that all "paternally related male individuals" will share the same Y-profile.

[4] Scott explained that p30 is "a protein that is present in high quantities in semen." However, p30 can also be found in lower concentrations in other bodily fluids, including bodily fluids secreted by women.  Consequently, a p30 test is merely a "presumptive test that indicates the possible presence of semen."  It cannot conclusively establish whether semen is present.

evidence. Gondik's trial strategy was to put the State to its burden of proof and argue the State had failed to prove that any sexual encounter between Doolittle and Denise had occurred on the night in question. In particular, Gondik suggested that Denise had dreamed the assault while intoxicated and had believed, upon waking, that it actually occurred. After the State rested its case, Gondik informed the circuit court that the defense would not present any evidence and that Doolittle did not intend to testify. Doolittle was placed under oath, and following a colloquy, the court accepted Doolittle's waiver of his right to testify, concluding it was made "freely, voluntarily, intelligently and knowingly."

¶13 The jury found Doolittle guilty of both second-degree sexual assault by use of force and incest. The circuit court imposed concurrent sentences totaling ten years' initial confinement and five years' extended supervision.

¶14 Doolittle moved for postconviction relief, arguing that Gondik was constitutionally ineffective by: (1) pursuing a false and objectively unreasonable trial strategy—i.e., that no sexual encounter occurred—even though Doolittle consistently told Gondik that a consensual sexual encounter had taken place; (2) failing to impeach Denise using prior statements that were inconsistent with her trial testimony; (3) failing to present testimony from Kim and Josh Loftus that Doolittle had stayed behind at Denise's camper after they left; (4) failing to investigate and cross-examine Doolittle's ex-wife, Shawna Doolittle, regarding Doolittle's inability to maintain an erection; (5) failing to present expert testimony from a toxicologist regarding the effects of alcohol and antidepressants on memory; and (6) erroneously advising Doolittle not to testify, and effectively forcing him to waive his right to testify by presenting a "false" defense. Doolittle also asked the circuit court to grant him a new trial in the interest of justice.

¶15    The circuit court held a *Machner*[5] hearing, during which both Gondik and Doolittle testified.   The defense also presented testimony from Shawna Doolittle and forensic toxicologist Glenn Hardin.  Although Kim and Josh Loftus did not testify at the *Machner* hearing, the defense presented an offer of proof as to what their testimony would have been.

¶16    The circuit court denied Doolittle's postconviction motion, concluding that Gondik's performance was neither deficient nor prejudicial.  The court also refused to grant a new trial in the interest of justice, concluding that the real controversy had been fully tried, even though the defense's strategy "just didn't work out the way the defense wanted it to."

¶17    Doolittle filed a notice of appeal from his judgment of conviction and from the order denying postconviction relief.  Thereafter, Doolittle filed a motion asking this court to stay his appeal and remand the matter to the circuit court for him to file either a supplemental postconviction motion or a motion to reconsider the denial of his original postconviction motion.  Doolittle sought to present evidence that his postconviction counsel had obtained from Nathan Cockerham, an attorney Doolittle met with before retaining Gondik.  We denied Doolittle's motion for remand, stating he had not persuaded us that he should be allowed to file a second postconviction motion.   We subsequently denied Doolittle's motion for reconsideration of our order denying his motion for remand. Additional facts are included below as necessary.

---

[5] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

## DISCUSSION

### I. Ineffective assistance of counsel

¶18    Whether an attorney rendered ineffective assistance is a mixed question of fact and law.  *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325.  We will uphold the circuit court's findings of fact unless they are clearly erroneous.  *Id.*  However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently.  *Id.*

¶19    To prevail on an ineffective assistance claim, a defendant must show both that his or her counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other.  *Id.* at 697.  Here, we conclude Doolittle has failed to establish that Gondik performed deficiently, and we therefore need not address the prejudice prong.

¶20    To establish deficient performance, a defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance."  *Id.* at 690.  We are "highly deferential to the reasonableness of counsel's performance."  *State v. Jenkins*, 2014 WI 59, ¶36, 355 Wis. 2d 180, 848 N.W.2d 786.  As such, we "must make every effort to reconstruct the circumstances of counsel's challenged conduct, to evaluate the conduct from counsel's perspective at the time, and to eliminate the distorting effects of hindsight."  *Id.*  "A defendant is not entitled to a perfect defense or the best defense, but only to one which gives him [or her] reasonably effective

representation." ***State v. Robinson***, 177 Wis. 2d 46, 56, 501 N.W.2d 831 (Ct. App. 1993).

### A. Pursuit of an objectively unreasonable trial strategy

¶21 Doolittle first argues that Gondik was ineffective by pursuing an objectively unreasonable trial strategy—i.e., claiming that no sexual encounter had occurred. Doolittle contends that strategy was unreasonable because "it was a lie, and Gondik knew it was a lie." Doolittle asserts that from the beginning, he told Gondik that he and Denise had attempted to have consensual sex, but that they were unable to accomplish penis-to-vagina intercourse. Doolittle argues Gondik should have pursued a defense theory that was consistent with this version of events. He asserts that strategy would have provided a defense to both charges because for the sexual assault charge, the State was required to prove that Denise did not consent to the sexual contact,[6] and for the incest charge, the State was required to prove that Doolittle had sexual intercourse (as opposed to sexual contact) with Denise.[7] Doolittle further contends that he did not understand until the second day of trial that "there would be no discussion of his explanation of a consensual encounter."

---

[6] *See* WIS. STAT. § 940.225(2)(a) (second-degree sexual assault by use of force requires proof that the defendant had "sexual contact or sexual intercourse with another person without consent of that person by use or threat of force or violence").

[7] *See* WIS. STAT. § 944.06 (incest requires proof that the defendant married or had nonmarital sexual intercourse with a person the defendant knew was a blood relative); *see also* WIS. STAT. § 948.01(6) (defining "sexual intercourse" as "vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction").

¶22 A defense attorney's trial strategy is afforded a presumption of constitutional adequacy. *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. Accordingly, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference." *State v. Balliette*, 2011 WI 79, ¶26, 336 Wis. 2d 358, 805 N.W.2d 334. We will not second-guess a reasonable trial strategy unless it was based on an irrational trial tactic or was based upon caprice rather than judgment. *Breitzman*, 378 Wis. 2d 431, ¶65. "In fact, where a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Id.* (citation omitted). The fact that a trial strategy ultimately proved unsuccessful does not make it any less reasonable, for purposes of evaluating an ineffective assistance claim. *State v. Maloney*, 2005 WI 74, ¶44, 281 Wis. 2d 595, 698 N.W.2d 583.

¶23 Like the circuit court, we conclude that Gondik's choice of trial strategy did not constitute deficient performance. First, we observe that although Doolittle argues he disagreed with Gondik as to the appropriate trial strategy, the circuit court rejected that claim and instead found that Doolittle understood Gondik's choice of defense and knowingly agreed to it. That factual finding is supported by the record and is not clearly erroneous.

¶24 Gondik testified at the *Machner* hearing that his strategy at trial was to put the State to its burden of proof and argue that Doolittle "didn't do it." More specifically, he intended to argue that no sexual contact or intercourse between Doolittle and Denise had occurred, and that Denise's report to the contrary was due to a combination of "drinking alcohol and vivid dreams." Gondik also testified that before trial, he told Doolittle that he intended to argue that no sexual encounter had occurred, and Doolittle agreed to that strategy. Gondik further testified that he and Doolittle reached a "consensus" that Gondik would not "be

10

making any argument that there was a consensual sexual encounter." Although Doolittle testified during the *Machner* hearing that he did not understand that Gondik would not be presenting a consent defense at trial, the circuit court found Gondik's testimony on that point more credible than Doolittle's. Doolittle has not demonstrated that the court's credibility finding in that regard was clearly erroneous. *See State v. Jenkins*, 2007 WI 96, ¶33, 303 Wis. 2d 157, 736 N.W.2d 24 (credibility determinations are subject to the clearly erroneous standard of review).

¶25 Moreover, Gondik provided a reasonable explanation during the *Machner* hearing for his choice of trial strategy. Gondik explained that he did not pursue a defense of a consensual sexual encounter that failed to meet the legal definition of sexual intercourse because Doolittle had told him during their first meeting that he was drunk during the sexual encounter and thus did not know whether his penis went into Denise's vagina. Gondik testified that after that first meeting, Doolittle never made a "flat-out denial" that intercourse had occurred. Gondik explained that given Doolittle's inability to conclusively state that his penis did not penetrate Denise's vagina, and given Denise's unequivocal testimony that it did, "I think that's a guilty [verdict] 100 out of 100 times." Stated differently, Gondik believed that if Doolittle testified that a sexual encounter had occurred, "it wasn't a large leap for the jury to conclude they had intercourse. So I thought he would be walking himself right into [a conviction on] the incest charge."

¶26 Gondik further explained that his trial strategy was informed by the need to "provide a defense on both counts simultaneously." Gondik testified he had discussed with Doolittle the possibility of admitting the incest charge and attempting to defend against the sexual assault charge on consent grounds, but

11

Doolittle rejected that approach because he "didn't want to go to prison." In addition, Doolittle was not interested in entering guilty pleas to the charges. Under these circumstances, Gondik testified that he believed the defense he presented was the only way to defend against both counts at trial.

¶27 Again, the circuit court found Gondik's testimony regarding his choice of defense strategy to be credible. The court rejected Doolittle's proposed alternative defense as unreasonable, explaining:

> I just think this weird defense strategy of having him testify that the incident occurred, but he's not sure whether or not he penetrated, to me, again, that's a great law school exam, but, in real life, that's not going to work very well. And, in fact, the chances of conviction, in my opinion, with that defense are 100 percent on the incest.

Again, "where a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Breitzman*, 378 Wis. 2d 431, ¶65 (citation omitted).

¶28 Doolittle raises three primary arguments on appeal as to why Gondik's chosen trial strategy was unreasonable. First, Doolittle asserts that during the *Machner* hearing, he "flatly denied" telling Gondik that he was too drunk to remember details of the sexual encounter with Denise. Doolittle contends his "written statements from the beginning of the case" show that he consistently provided "detailed accounts of a consensual attempt at sex." We reject this argument because Gondik expressly testified that during their first meeting, Doolittle stated he was drunk during the sexual encounter and therefore did not know whether his penis had penetrated Denise's vagina. Gondik further testified that after that initial meeting, Doolittle never "flat-out" denied that

12

intercourse had occurred. The circuit court found Gondik's testimony to be credible.

¶29 Furthermore, the written statements that Doolittle relies upon do not unequivocally assert that intercourse did not take place. In one statement, Doolittle wrote that he "began to try to get inside" Denise with his penis, but he was "[d]runk as all heck" and "[i]t wasn't going well." "After trying for several 'pumps' and not really getting in," Denise told him that she was going to get something, and he passed out while waiting for her to return. In another statement, Doolittle wrote: "I tried a few times to engage my penis into her vagina but it seemed like I wasn't long enough. So I kept making adjustments and it took a lot of effort because she is a bigger girl. … I don't actually remember if I did engage." Neither of these written statements shows that Doolittle unequivocally remembered that his penis did not penetrate Denise's vagina. As such, they would not have alleviated Gondik's reasonable concern that if he pursued a consent defense at trial, Doolittle's equivocal testimony about whether he and Denise actually had sexual intercourse was not likely to convince the jury.

¶30 Second, Doolittle argues that Gondik relied on an unfounded concern about suborning perjury in support of his chosen trial strategy. We conclude, however, that Gondik's concern was reasonable under the circumstances. As explained above, Gondik testified that his trial strategy was rooted in providing a defense to both charges against Doolittle. However, Gondik believed that if Doolittle testified, consistent with his prior statements, that he did not actually know whether his penis had penetrated Denise's vagina, the jury would convict him of incest. Gondik was also concerned that if Doolittle changed his story and testified that he was certain no intercourse had occurred, that testimony would amount to perjury. Although Gondik admitted Doolittle never

stated that he planned to "get up on the stand and lie," Gondik's concern about Doolittle changing or embellishing his story was not unreasonable.

¶31 Third, Doolittle argues that Gondik's strategy of arguing that no sexual encounter took place was unreasonable because it conflicted with the physical evidence introduced at trial. Doolittle argues the physical evidence was, however, "consistent with the consensual encounter Doolittle described."

¶32 We reject this argument because Gondik, with the assistance of Attorney Funk, was able to provide alternative explanations for, or discredit, much of the physical evidence that the State introduced. For instance, during her cross-examination of Scott, the DNA analyst, Funk established that all paternally related males share the same Y-profile, and that Doolittle would therefore have the same Y-profile as his father and all of his other paternally related male relatives. There was evidence at trial that after Denise reported the assault, she was clinging to her brother, who is also Doolittle's father. Scott conceded on cross-examination that under those circumstances, it would be reasonable to expect that some of Doolittle's father's DNA could have transferred onto Denise's body and clothing. Scott further conceded that he could not determine whether the Y-profile found on Denise's shorts, abdomen, and thighs belonged to Doolittle or to his father.

¶33 Gondik also elicited testimony that following the assault, Denise told one of the officers that she had hugged Doolittle on the night in question. On cross-examination, Scott conceded that DNA can transfer from one person to another during a hug. Gondik therefore argued that Denise's DNA could have transferred to Doolittle's clothing when she hugged him, or at some point earlier in the evening when they were together at the bar.

¶34 Gondik also argued that it made sense that Doolittle's DNA would be found on the blanket on Denise's bed in the camper, as it was undisputed that Doolittle was found asleep in that bed after Denise reported the assault. Gondik further argued there was an "innocent explanation" for Doolittle's DNA being on the carpet in Denise's camper—specifically, that Doolittle "was in the trailer" on the night in question. Moreover, while the State argued that the blood stain on the camper's carpet and the abrasions on Doolittle's knees supported Denise's claim that he had sexually assaulted her, Scott conceded on cross-examination that the test performed on the carpet was merely a "presumptive" test for blood and that it was possible for other materials to produce a positive result. In addition, Gondik argued that the "very small" abrasions on Doolittle's knees, which had no blood around them, were "not the kind of wounds that would bleed all over a carpet."[8]

¶35 As for the p30 evidence, we agree that evidence indicating the possible presence of semen on Denise's vaginal, cervical, perineal, abdominal, and thigh swabs, as well as on her blanket and on Doolittle's t-shirt, tends to contradict Gondik's argument at trial that no sexual encounter occurred. However, Scott conceded during his testimony that the p30 test is merely a presumptive test for semen, and a positive result does not conclusively establish that semen is present. Scott also conceded on cross-examination that p30 can be found in other

---

[8] Doolittle emphasizes that during his opening statement, Gondik stated the evidence would show that Doolittle "fell and scraped his knees." Doolittle asserts that despite that promise, "no evidence was presented to support the claim of Doolittle falling and scraping his knee[s]." We agree with the State, however, that this single sentence during Gondik's opening statement, uttered at the beginning of a three-day jury trial, was not likely to have had any effect on the jury's verdicts. Moreover, the jury was expressly instructed that opening statements are not evidence. We presume that jurors follow the court's instructions, *see* ***State v. Truax***, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989), and there is no evidence that the jurors did not do so here.

biological fluids and can be secreted by women. Scott further conceded that while p30 is present in higher concentrations in semen than in other bodily fluids, the p30 test does not detect the concentration of p30, but merely shows whether p30 is present in any quantity.

¶36 In addition, Funk obtained admissions from Scott that the evidence collection and handling processes used by law enforcement in this investigation risked contamination of the evidence. For instance, Scott testified that only one piece of evidence should be placed in a single bag, and that placing multiple pieces of evidence in the same bag creates a risk that DNA will be transferred from one item to another. In closing, Gondik argued that was precisely what occurred in this case when law enforcement placed all of Denise's clothes in a single bag, and all of Doolittle's clothes in a single bag. Gondik also emphasized that one of the officers had used the same pair of gloves when handling multiple pieces of evidence, whereas Scott had testified that a new pair of gloves should be used for each piece of evidence to prevent contamination.

¶37 Thus, while Doolittle argues that Gondik's trial strategy was inconsistent with the physical evidence introduced at trial, the record shows that Gondik and Funk were able to provide alternative explanations for, or discredit, much of the physical evidence. Moreover, although Doolittle asserts that his preferred defense strategy would have been consistent with all of the physical evidence the State introduced, that is not the case. Doolittle's theory—i.e., that a consensual sexual encounter occurred, but with no vaginal penetration—would not have explained the p30 tests showing the possible presence of semen on Denise's vaginal and cervical swabs. In addition, Doolittle's theory would not have explained the abrasion inside Denise's vagina.

¶38    On this record, the circuit court concluded it was reasonable for Gondik and Funk to challenge the physical evidence to the best of their abilities, while arguing that no sexual encounter had occurred and that the State had failed to meet its burden of proof. The court concluded it would have been reasonable for the jury "to have bought the defense and found that the physical evidence didn't support the theory that the State had." The court further concluded that with respect to his choice of trial strategy, Gondik was "really put in a tough situation and he did the best with what he could have." We agree with the court's analysis and conclude that under the circumstances, Gondik's choice of trial strategy was not objectively unreasonable. As such, Gondik's performance was not deficient in that regard.

### B. Failure to adequately cross-examine witnesses and present evidence

### i. Impeachment of Denise with prior inconsistent statements

¶39    Doolittle next argues that Gondik was ineffective by failing to impeach Denise with prior statements that were inconsistent with her trial testimony. He cites Denise's initial statement to Deputy Carey, in which she stated that: (1) she did not know what time she left the bar to return to her camper; (2) she returned to her camper and began getting ready for bed; (3) she heard the camper door open, and Doolittle walked in, uninvited; and (4) Doolittle immediately began making sexual advances toward her. Doolittle also cites a second statement that Denise gave to Sheriff's Deputy Cynde Hunter, in which she stated that: (1) she returned from the bar to her camper at 11:30 or 11:45 p.m.; (2) Doolittle knocked on the camper door at about 1:30 a.m.; (3) she invited Doolittle inside and offered him a beer, but she did not think he took it; (4) they sat down and talked, and when Denise was ready for Doolittle to leave, she walked

17

him to the door and opened it; and (5) Doolittle then slammed the door and began making aggressive sexual advances toward her.

¶40    Doolittle asserts that both of these statements were inconsistent with Denise's trial testimony, in which she "acknowledged spending hours drinking at the bar with Doolittle and the Loftuses, returning to her camper around 2 am for more drinking, and then claimed Doolittle left and returned under false pretenses to assault her."    Doolittle specifically contends that Gondik should have used Denise's prior statements to impeach her trial testimony with:  (1) her false claim to Deputy Carey that Doolittle entered her camper uninvited; (2) her false claim to Deputy Hunter that she returned from the bar at 11:30 or 11:45 p.m., and that Doolittle arrived alone two hours later; and (3) her failure to mention in either statement that she and Doolittle were drinking in her camper with Kim and Josh Loftus before the assault.

¶41    The circuit court rejected Doolittle's argument that Gondik performed deficiently by failing to impeach Denise with her prior inconsistent statements, concluding that Gondik "did a very thorough cross-examination of" Denise.  Although the court acknowledged that Gondik may have "missed an inconsistent statement here or there," it concluded that failure did not amount to deficient performance.  The court also reasoned: "At some point, you have a victim on the witness stand that at least the jury is looking at and if you beat them up too much, you know, you create problems.  And he did his cross-examination that he felt was necessary."

¶42    We agree with the circuit court's analysis.  The record shows that Gondik thoroughly and effectively impeached Denise's trial testimony.    In particular, the record shows that Gondik did cross-examine Denise regarding

inconsistencies between her trial testimony and her statement to Deputy Hunter. For instance, Denise conceded on cross-examination that she did not recall saying various things recounted in her statement to Hunter, such as that she had offered Doolittle a beer when he came to her camper, or that she had walked him to the door and hugged him.

¶43     Gondik also pointed out discrepancies between Denise's testimony and her statement to Deputy Carey. For example, while Denise told Carey that Doolittle had assaulted her for at least ten minutes, she testified at trial that the assault lasted three to five minutes. Gondik confronted Denise with this discrepancy on cross-examination, and she claimed she could not remember telling Carey that the assault lasted at least ten minutes.

¶44     Gondik also emphasized on cross-examination that Denise had told the emergency room physician that after Doolittle left her camper, he returned thirty minutes later and assaulted her. That statement was inconsistent with Denise's trial testimony that Doolittle had returned after only three to five minutes. Gondik also pointed out that while Denise testified at trial that she hit her head and briefly lost consciousness when Doolittle pushed her, she denied either hitting her head or losing consciousness when speaking to the emergency room physician.

¶45     The foregoing is merely a summary of some of the ways in which Gondik impeached Denise's trial testimony. We have not endeavored to provide an exhaustive list of every instance in which Gondik impeached Denise's testimony or highlighted an inconsistency with her prior statements. Nevertheless, and regardless of the circuit court's concern that a more exhaustive examination of Denise may have offended the jury, our review of the record confirms the court's

conclusion that Gondik thoroughly and effectively cross-examined Denise, even though he may not have mentioned every inconsistency that Doolittle now raises on appeal. We therefore agree with the court that Gondik's cross-examination of Denise did not amount to deficient performance.

### ii. Testimony of Kim and Josh Loftus

¶46    Doolittle next argues that Gondik was ineffective by failing to present testimony from Kim and Josh Loftus at trial. Doolittle asserts that "[f]rom the beginning" of the case, he "insisted" to Gondik that the Loftuses were important witnesses to his defense. He contends that he sent Gondik multiple emails emphasizing the importance of the Loftuses' testimony, and that he even told Gondik he had set aside "several thousand dollars" to pay for the Loftuses to travel to Wisconsin from Georgia to testify at trial.

¶47    As noted above, the Loftuses did not testify during the *Machner* hearing. However, according to an affidavit submitted by the defense, both Kim and Josh Loftus would have testified that: (1) they were drinking and socializing with Denise and Doolittle at the campground bar until around closing time, when they left to go to Denise's camper for food; (2) after they arrived at the camper, they talked and drank until Josh fell asleep; and (3) Kim then woke Josh, and the two of them left the camper, while Doolittle stayed behind with Denise.

¶48    At the *Machner* hearing, Gondik acknowledged that Doolittle had stressed the importance of calling the Loftuses to testify at trial. Gondik explained, however, that after he talked to Kim Loftus, he determined the Loftuses' testimony "would be of no significance," given the defense's strategy of arguing that no sexual encounter had taken place. Gondik further testified that

20

after his conversation with Kim, he discussed the situation with Doolittle, who "agreed that [the Loftuses] weren't necessary to be at the trial."

¶49  The circuit court concluded that Gondik was not deficient for failing to present the Loftuses' testimony at trial because the Loftuses did not have "much to add" and their proposed testimony would not have "ma[de] any difference." We agree.  The Loftuses' proposed testimony was consistent with Denise's trial testimony that:  (1) she was drinking at the campground bar with Doolittle and the Loftuses until 1:30 or 2:00 a.m.; (2) the four of them then went to Denise's camper, where they continued talking and drinking; and (3) the Loftuses ultimately left the camper, and "right after them, [Doolittle] was out the door within a minute."  Because the Loftuses' testimony would not have contradicted Denise's trial testimony, Gondik could reasonably conclude that their testimony would not have aided Doolittle's defense.

¶50  Doolittle argues the circuit court erred by concluding that Gondik did not perform deficiently in this regard because the court's analysis "represents an elision of the prejudice prong with the deficient performance prong"—presumably because the court stated that the Loftuses' proposed testimony would not have made any difference.  We reject this assertion.  Whether the Loftuses' testimony would have added anything to Doolittle's defense was a proper factor for Gondik to consider when deciding whether to present their testimony at trial. Gondik's reasonable conclusion that the Loftuses' testimony would not have helped the defense supports a determination that he did not perform deficiently by failing to call them as witnesses.

¶51  Doolittle also argues that the circuit court's analysis was "simply wrong in terms of the importance of [the Loftuses'] testimony to the defense

case." He asserts the Loftuses' testimony that Doolittle stayed behind at Denise's camper after they left would have supported a conclusion that the sexual encounter between Doolittle and Denise was consensual. He therefore contends that the Loftuses' proposed testimony "supports the belief that Gondik presented an objectively unreasonable defense." Again, we disagree. We have already concluded that Gondik's choice of defense was not unreasonable under the circumstances. The Loftuses' proposed testimony—which was consistent with Denise's trial testimony regarding the events leading up to the alleged assault— does nothing to change that conclusion.

### iii. Investigation and cross-examination of Shawna Doolittle

¶52 Doolittle also argues that Gondik was ineffective by failing to investigate potential testimony by Doolittle's ex-wife, Shawna, that would have been helpful to the defense, and by failing to elicit that helpful testimony from Shawna when cross-examining her at trial. The State called Shawna as a witness at trial to corroborate the fact that Doolittle had undergone a vasectomy. The State argued Doolittle's vasectomy explained why no sperm cells were found in any of the areas that tested positive for p30—i.e., the protein found in high concentrations in semen.

¶53 Doolittle asserts that if Gondik had interviewed Shawna before trial, he would have learned that she could have provided other testimony that would have been helpful to the defense. Specifically, Shawna testified at the ***Machner*** hearing that it was difficult for Doolittle to have an erection while intoxicated, and that it became even more difficult after his vasectomy. Doolittle contends this testimony would have supported a theory that no sexual intercourse occurred

22

during his encounter with Denise, only sexual contact, which would have provided a defense to the incest charge.

¶54     Like the circuit court, we conclude Gondik did not perform deficiently by failing to investigate Shawna's potential testimony or cross-examine her regarding Doolittle's ability to have an erection following his vasectomy. During the *Machner* hearing, Shawna testified that she attempted to contact Gondik multiple times before trial to relay this information, but no one from Gondik's office ever got back to her.  On cross-examination, however, Shawna conceded that she could not remember whether she ever left a message at Gondik's office.  Gondik testified that he had no memory of Shawna attempting to contact his office before trial, and there was no "indication from anyone in [his] office" that she had attempted to do so.

¶55     The circuit court found credible Gondik's testimony that he did not learn about Shawna's potential testimony until after trial.  Conversely, the court stated Shawna's *Machner* hearing testimony that she had repeatedly attempted to contact Gondik before trial was not "very credible."  In particular, the court noted that Shawna was present at trial, and it questioned why she would not have said something about Doolittle's alleged inability to maintain an erection at that point. These credibility findings are not clearly erroneous, and they support the court's determination that Gondik did not perform deficiently by failing to investigate and cross-examine Shawna.

¶56     In addition, Gondik testified during the *Machner* hearing that Doolittle never informed him of any difficulty having an erection while intoxicated or after his vasectomy.  That information was within Doolittle's own knowledge, and on appeal, he does not cite any evidence showing that he

23

conveyed the information to Gondik either before or during trial. As the circuit court aptly noted, Gondik cannot have performed deficiently by failing to raise an issue at trial that was never brought to his attention. *See Nielsen*, 247 Wis. 2d 466, ¶23 (court of appeals "will not find counsel deficient for failing to discover information that was available to the defendant but that defendant failed to share with counsel").

¶57     Furthermore, Shawna's testimony about Doolittle's difficulty having an erection would have been refuted by a written statement that Doolittle provided to Gondik before trial, in which Doolittle expressly admitted that his penis was erect during the sexual encounter with Denise. We agree with the State that Gondik was not deficient by failing to discover and present testimony that would have been refuted by Doolittle's own statement.

### iv. Testimony of a toxicology expert

¶58     Doolittle also argues that Gondik was ineffective by failing to retain an expert toxicologist to testify that Denise's alcohol intoxication, in combination with her use of the antidepressant citalopram, affected her ability to remember what happened on the night of the alleged assault. At the *Machner* hearing, Doolittle presented the testimony of forensic toxicologist Glenn Hardin in support of this claim. Hardin testified that as a person's blood alcohol concentration (BAC) rises, "it can affect the ability of the transfer of memory from short-term storage to long-term storage. So that, essentially, a person after a drinking episode can wake up the next morning and not remember things that they did during a drinking episode." Hardin also testified that based on his calculations, Denise's BAC would have been "at least" 0.13 at the time of the alleged assault. Based on

Denise's BAC, Hardin opined that she would have "experience[d] a partial memory loss due to alcohol consumption."

¶59     The circuit court correctly determined that Hardin's testimony did not establish that Gondik performed deficiently by failing to retain an expert toxicologist to testify at trial. The court explained that it would have excluded Hardin's testimony regarding the effects of alcohol on Denise's memory for two reasons.

¶60     First, the circuit court concluded that Hardin's testimony would not have been "helpful" to the jury. The court noted that Denise had conceded at trial that she was intoxicated at the time of the alleged assault. The court also observed that Gondik's cross-examination of Denise had highlighted problems with Denise's memory of the relevant events. As such, the court would have excluded Hardin's testimony because it was cumulative, see WIS. STAT. § 904.03, and therefore would not have assisted the jury in understanding the evidence or determining a fact in issue, see WIS. STAT. § 907.02(1). The court would not have erroneously exercised its discretion by excluding Hardin's testimony on those grounds. *See* ***State v. Dobbs***, 2020 WI 64, ¶27, 392 Wis. 2d 505, 945 N.W.2d 609 (stating the admission of expert testimony lies within the circuit court's discretion).

¶61     Second, the circuit court explained that it would have excluded Hardin's testimony regarding the effects of alcohol on Denise's memory because Hardin was not qualified to give an expert opinion regarding alcohol intoxication and memory loss. The record supports that determination. Hardin's curriculum vitae does not show that he has completed any work, research or special training in the area of alcohol intoxication and memory. When asked during the ***Machner***

25

hearing whether he had any "special training or experience regarding how memory works," Hardin responded, "I've studied it some." He then clarified that he had "read some journal articles" regarding that topic, and it had "come up in some presentations" he had attended. On this record, the court would not have erroneously exercised its discretion by excluding Hardin's testimony on the grounds that he was not qualified to provide an expert opinion regarding the effect of alcohol intoxication on a person's memory. Gondik did not perform deficiently by failing to seek the admission of expert testimony that would have been properly excluded.

¶62 Hardin also testified during the *Machner* hearing that the antidepressant citalopram, which Denise was taking at the time of the assault, "can be associated with memory loss." Hardin later clarified, however, that the Food and Drug Administration's package insert for citalopram states that it may cause hyponatremia (low sodium), which in turn may cause "memory impairment." Hardin conceded that Denise's medical records showed that her sodium level was within the reference range, which indicated that any memory loss she experienced was not the result of hyponatremia. Hardin therefore admitted that Denise's use of citalopram did not have any impact on his opinion regarding her ability to remember what happened on the night of the alleged assault. Accordingly, Hardin's testimony does not show that Gondik performed deficiently by failing to retain an expert toxicologist to testify as to the effect of citalopram on Denise's memory.

### C. Doolittle's waiver of his right to testify

¶63 Doolittle also argues that Gondik was ineffective by erroneously advising him to waive his right to testify and by effectively forcing him to waive

that right by presenting a "false" defense. Doolittle asserts that by choosing to present a defense that was completely contrary to Doolittle's statements—and by doing so without Doolittle's full understanding of the strategy—Gondik forced him to choose between three untenable options: "(1) testify truthfully, and completely contradict the entire defense; (2) testify falsely, consistent with the defense presented, but committing perjury; or (3) not testify at all, and leave the jury without his side of the story." Doolittle argues that under these circumstances, Gondik's unreasonable trial strategy deprived him of a fair choice of whether to testify.

¶64 We have already concluded that Gondik's chosen trial strategy was not unreasonable. Gondik's advice that Doolittle should not testify at trial was consistent with that strategy. We therefore reject Doolittle's assertion that Gondik performed deficiently by advising him not to testify.

¶65 We also reject Doolittle's claim that Gondik performed deficiently by effectively forcing him to waive his right to testify. Gondik testified at the *Machner* hearing that from the beginning of the case, it was his position that Doolittle should not testify at trial. Gondik testified that he made his opinion clear to Doolittle and explained why he thought Doolittle should not testify. Gondik further testified that Doolittle agreed to Gondik's chosen trial strategy and agreed that, consistent with that strategy, he would not testify at trial. Doolittle confirmed during his *Machner* hearing testimony that although Gondik advised him not to testify, Gondik also informed him that the choice was Doolittle's to make. While Doolittle also testified that he felt forced to waive his right to testify as a result of Gondik's trial strategy, the circuit court did not find his testimony in that regard credible. The court instead credited Gondik's testimony that Doolittle agreed to Gondik's chosen trial strategy and therefore agreed not to testify at trial. These

27

credibility findings are not clearly erroneous and support a determination that Gondik did not force Doolittle to waive his right to testify.

¶66    Moreover, the circuit court conducted a colloquy with Doolittle regarding his waiver of the right to testify, during which Doolittle confirmed that:  (1) he understood he had the right to testify at trial, as well as the right not to testify; (2) Gondik had explained the advantages and disadvantages of testifying and not testifying; (3) he had enough time to speak with Gondik about his decision not to testify; (4) he understood that the decision was his alone to make; (5) no one had pressured him, threatened him, or made any promises to induce him to give up his right to testify; and (6) he was giving up his right to testify of his own free will.  Following this colloquy, the court determined that Doolittle's waiver of his right to testify was knowing, intelligent, and voluntary.   Doolittle's representations during the colloquy further support a determination that Gondik did not force him to waive his right to testify and, as such, did not perform deficiently in that regard.

## II.  New trial in the interest of justice

¶67    Doolittle next argues that we should exercise our discretionary reversal power under WIS. STAT. § 752.35 to grant him a new trial in the interest of justice because the real controversy was not fully tried.   We exercise our discretionary reversal power only in exceptional cases.  *See* ***State v. Doss***, 2008 WI 93, ¶86, 312 Wis. 2d 570, 754 N.W.2d 150.   When a defendant seeks discretionary reversal on the grounds that the real controversy was not fully tried,

> [s]uch exceptional cases are generally limited to cases in which the jury was erroneously denied the opportunity to hear important testimony bearing on an important issue of the case, when the jury had before it evidence not properly admitted that "so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried," or

> when an erroneous instruction prevented the real controversy in a case from being tried.

*Id.* (citation omitted).

¶68    Doolittle argues this is such an exceptional case because Gondik presented a "false" defense, which was contrary to both Doolittle's description of the events and the physical evidence introduced by the State.  As a result, Doolittle contends the jury was never asked to consider whether the sexual contact between Doolittle and Denise was consensual, or whether sexual intercourse actually occurred.  Instead, Doolittle argues Gondik "made numerous arguments and insinuations that clouded the real controversy by asking the jury to consider falsehoods"—specifically, the false theory that no sexual encounter had occurred and that Denise had dreamed the alleged assault.

¶69    Doolittle further argues that the jury did not hear "substantial evidence that would have allowed it to properly consider the real issues—whether the sexual encounter was consensual, and whether intercourse occurred."  In particular, he asserts the real controversy was not fully tried because the jury did not hear his own testimony, evidence impeaching Denise's credibility, the Loftuses' testimony, Shawna's testimony regarding his difficulty maintaining an erection, and the testimony of a toxicology expert.  He contends:

> The evidence from Doolittle would have provided a credible explanation for events indicating that he and [Denise] engaged in an awkward, drunken, and taboo but consensual encounter.  Further, Doolittle's testimony, in combination with information from Kim and Josh Loftus, as well as Hardin, would have demonstrated that [Denise's] memory of events was completely unreliable, and Doolittle's conduct was not predatory.  And Doolittle's testimony, combined with Shawna's information, would have supported the argument that the State could not prove intercourse.

29

¶70 Doolittle's argument that the real controversy was not fully tried is merely an attempt to repackage his unsuccessful ineffective assistance claims. He does not actually assert that any evidence was improperly admitted at trial; he merely claims that Gondik's trial strategy was improper. And while he asserts that the jury was denied the opportunity to hear important evidence, that evidence was largely related to Doolittle's consent defense. We have already determined that Gondik's trial strategy—i.e., arguing that no sexual encounter took place—was reasonable under the circumstances, and that Doolittle agreed with Gondik's chosen strategy.[9]

¶71 WISCONSIN STAT. § 752.35 "was not intended to vest this court with power of discretionary reversal to enable a defendant to present an alternative defense at a new trial merely because the defense presented at the first trial proved ineffective." *State v. Hubanks*, 173 Wis. 2d 1, 29, 496 N.W.2d 96 (Ct. App. 1992). The fact that Doolittle's case could have been tried differently does not establish that the real controversy was not fully tried. Ultimately, this case is not an exceptional one warranting the exercise of our discretionary reversal power, and we therefore decline to grant Doolittle a new trial in the interest of justice.

---

[9] In addition, we have already determined that Gondik thoroughly and effectively impeached Denise's credibility at trial; that the Loftuses' proposed testimony did not contradict Denise's trial testimony; that Shawna's testimony contradicted Doolittle's own statement indicating that he had an erection during the sexual encounter with Denise; that Hardin's testimony regarding the effects of alcohol on Denise's memory would have been properly excluded; and that Hardin could not actually have testified that Denise's use of citalopram affected her memory. Accordingly, the absence of this evidence did not prevent the real controversy from being fully tried.

**III. Motions for remand and reconsideration**

¶72　Finally, Doolittle argues that this court erroneously exercised its discretion by denying his motion to remand this matter to the circuit court and his subsequent motion to reconsider that denial.[10]　Doolittle sought to present evidence that his postconviction counsel had obtained from Nathan Cockerham, an attorney Doolittle met with before retaining Gondik.　In an affidavit attached to Doolittle's motion for remand, Cockerham averred that during his meeting with Doolittle in July 2016, Doolittle "described drinking alcohol" and "lacked memory for certain questions," but he nevertheless "provided a detailed description of events," and "at no point did he indicate that he was too drunk to remember what happened that night."　Doolittle's motion for remand also included a transcript of an audio recording of his July 2016 meeting with Cockerham.

¶73　Doolittle contends this evidence would have contradicted Gondik's testimony that when he initially met with Doolittle, Doolittle did not remember many details of the alleged assault and claimed that he was too drunk to remember what happened.　As such, Doolittle argues this evidence would have damaged Gondik's credibility and bolstered Doolittle's own credibility, which would have been significant, given the importance of the circuit court's credibility findings to its ultimate decision that Gondik was not ineffective.　Doolittle notes that in our order denying his motion for remand, we reasoned that because the circuit court had already held a hearing on Doolittle's postconviction motion, we were not persuaded that a remand for a second postconviction motion was warranted.　He

---

[10]　The parties agree that if we have authority to consider these arguments, the applicable standard of review is the erroneous exercise of discretion standard.

argues that reasoning was flawed because his motion "raised newly-discovered evidence," which he should be allowed to present to the circuit court so that it may correct its factual errors regarding the witnesses' credibility.

¶74    In response, the State asserts that Doolittle's arguments regarding our denials of his motion to remand and his subsequent motion to reconsider are not properly before us.  We agree.  Doolittle cites no legal authority in support of the proposition that we may review on appeal from a circuit court's judgment or order our own order denying an appellant's motion for remand, or our subsequent denial of a motion for reconsideration of that order.  We need not address arguments that are unsupported by references to legal authority.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶75    Even if we were to construe Doolittle's arguments regarding our denials of his motions for remand and reconsideration as a second motion for reconsideration, we would nevertheless reject his arguments on the merits.  As the State correctly notes, there is no existing legal standard addressing how this court should evaluate a defendant's motion to remand a matter to present new evidence in support of a postconviction motion that the circuit court has already denied.  We agree with the State, however, that at a minimum, a defendant in these circumstances should be required to prove that: (1) the evidence was discovered after the *Machner* hearing; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.  *Cf. State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 48, 750 N.W.2d 42.

¶76    Doolittle has failed to satisfy these criteria because he has not shown either that the evidence in question was discovered after the *Machner* hearing or

that he was not negligent in seeking the evidence. Doolittle was aware, prior to the *Machner* hearing, of what he told Cockerham during their July 2016 meeting. Given that knowledge, he presents no persuasive reason as to why he could not have presented evidence at the *Machner* hearing regarding the substance of his meeting with Cockerham.

¶77 In his reply brief, Doolittle argues he was unable to present this evidence at the *Machner* hearing because Gondik refused to speak with his postconviction attorney before the hearing, and postconviction counsel was therefore "unaware of the need to present Cockerham's rebuttal testimony." We do not find this argument convincing. Again, Doolittle knew what he told Cockerham during their July 2016 meeting. Doolittle also testified during the *Machner* hearing that during his discussions with Gondik, Gondik repeatedly asserted that Doolittle was too drunk to remember the details of the sexual encounter. Doolittle therefore should have been on notice that Gondik would repeat those assertions during his *Machner* hearing testimony in order to explain his choice of trial strategy. Under these circumstances, Doolittle has failed to show that we erroneously exercised our discretion by denying his motion to remand, or his subsequent motion for reconsideration of that denial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.